PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name  REED _____ JESSE _____ L. _____
      (Last)              (First)          (Initial)

Prisoner Number  D-07717 _____

Institutional Address  SAN QUENTIN STATE PRISON; SAN QUENTIN CA 94974

---

**E-filing**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CV 08 2858 MHP

JESSE L. REED

Full Name of Petitioner

vs.

ROBERT L. AYERS, WARDEN

Name of Respondent
(Warden or jailor)

Case No.(To be provided by the clerk of court)

(PR)

PETITION FOR A WRIT OF HABEAS CORPUS

---

Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

    1.    What sentence are you challenging in this petition?

       PETITIONER IS CHALLENGING DENIAL OF PAROLE

       (a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland): BOARD OF PRISON HEARINGS

NOT CHALLENGING COORT DECISION     _____

             Court                        Location

       (b)    Case number, if known _____

       (c)    Date and terms of sentence _____

       (d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes  X  No

Where?   SAN QUENTIN STATE PRISON; SAN QUENTIN, CA 94974.  _____

           (Name of Institution)           (Address)

    2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

  FIRST DEGREE MURDER  _____

_____

_____

    3.    Did you have any of the following?

Arraignment: Yes __ No __   Preliminary Hearing: Yes __ No __ Motion to Suppress: Yes __ No __

4.    How did you plead?

Guilty _X_____    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?   Yes __ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes _X_        No __
(b)    Preliminary hearing          Yes X        No __
(c)    Time of plea   Yes _X_        No _
(d)    Trial   Yes __        No __
(e)    Sentencing   Yes _X_        No __
(f)    Appeal        Yes _____        No X
(g)    Other post-conviction proceeding    Yes __        No __

8.    Did you appeal your conviction?   Yes _X_ No __

        (a)    If you did, to what court(s) did you appeal?

Court of Appeal        Yes X___    No __    UNKNOWN _____
                                            (Year)                    (Result)

Supreme Court of
California        Yes-___    No __-    _____
                                            (Year)                    (Result)

Any other court    Yes __    No __    _____
                                            (Year)                    (Result)

        (b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                                Yes __  No __

        (c)    Was there an opinion?        Yes    No

        (d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                            Yes            No

4

If you did, give the name of the court and the result:

---

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes  X    No __

SEE ATTACHED EXHIBIT "B".

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a.    _____

b.    _____

c.    _____

d.    _____

Result _____ Date of Result _____

II.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a.    _____

b.    _____

c.    _____

d.    _____

Result _____ Date of Result _____

III.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

     (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?     Yes __ No _X_

_____

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: _SEE ATTACHED PAGES 2-8_

Supporting Facts: _SEE ATTACHED PAGES 2-8_

Claim Two: _SEE ATTACHED PAGES 8-15_

Supporting Facts: _SEE ATTACHED PAGES 8-16_

Claim Three: _SEE ATTACHED PAGES 16-18_

Supporting Facts: _SEE ATTACHED PAGES 16-18_

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

SEE ATTACHED PAGES

Do you have an attorney for this petition?   Yes __ No X_   PETITIOER REQUEST
APPOINTMENT OF COUNSEL

If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on _6/2/08_____
Date

_____
Signature of Petitioner

( rev. 5/96)

## **INTRODUCTION**

Jesse Reed, (Petitioner) appeared before the Board of Parole Hearings (Board) January 23 2007 for his third subsequent parole consideration hearing and was found suitable for parole. The Board specifically found Petitioner suitable for parole, stating that he would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Exhibit "A" p.80

After Petitioner's parole date was confirmed by the Board on May 23, 2007, it went before the Governor's review in accordance with Article V, Section 8 (b) of the California Constitution at which time the Governor based his decision on the nature of the commitment offense, and the Alameda County District Attorney's Office and the Oakland Police Department opposition to parole. Exhibit "B" p.2

///////////////
///////////////
///////////////

1

## CONTENTION

### I.

### THE GOVERNOR'S REVERSAL OF THE FINDING PETITIONER SUITABLE FOR PAROLE BY THE BOARD OF PAROLE HEARINGS, VIOLATES PETITIONER'S STATE AND FEDERAL DUE PROCESS, AS WELL AS THE FEDERAL CONSTITUTIONAL PROHIBITION AGAINST EX POST FACTO

Article V, Section 8 (b) amended the California Constitution by voter referendum )Proposition 89) on November 8, 1988. The amendment allows the governor to reverse, modify, or approve a grant of parole by the Board.

Petitioner contends that this amendment has been applied retroactively to allow the Governor to reverse his grant of parole suitability. Even enactment by Congress, with its unmatched legislative powers, are not construed to have retroactive effect unless their languages require it. INS. v. St. Cyr, (2001) 50 L.Ed.3d 347, '21 S.Ct. 2271. This Retroactive application of the amendment violates Petitioner s constitutional rights. The Ex Post Facto Clause guards against the "danger that legislatures might disfavor certain persons after the fact .." Garner v. Jones, (2000) 529 U.S. 244, 253. Petitioner asserts that the Governor's reversal of his finding of parole suitability by the Board falls within the scope of ex post facto application of law and is prohibited by the Federal Constitution.

The test to determine whether a retroactive change in parole laws violate the prohibition against ex post facto law, is two pronged. First the law in question must have been enacted after the commission of the crime. Secondly, it must be created a significant risk of increasing his punishment.

Petitioner satisfies both prongs of this test.

Clearly, the Governor received his power to reverse his parole more than four years after the commission of his crime; and; retroactive application of that power has prolonged his incarceration.

Petitioner was convicted of first degree murder, and was sentenced to 25 years-to-life. Petitioner became eligible for parole on October 23, 200%. At the time Petitioner committed his crime, the Board was the sole entity authorized to determine when a person convicted of murder would be released. The Board had now found Petitioner suitable for parole. Subsequently, the Governor acting pursuant to provision afforded him under Article V, Section 8 (b) reversed his parole and ordered his continued incarceration.

Article V, gave the Governor power to review leave intact reverse, and/or modify the Board's decision to grant parole to convicted murders. Supporters of Proposition 89 pointed out that the Governor always had "the power to grant reprieves, pardons and commutations" and thus could always "act on behalf of more lenient treatment of convicted criminals."

Proposition 89 was implemented to block the parole of prisoners as a means to block the parole of prisoners as a means to block the parole of murderers who would otherwise be released thereby increasing their punishment. It is undisputable that Petitioner would currently be out of prison had Proposition 89 not passed, adding Article V. Section 8 (b) to the California Constitution. Thus, the provision as applied to him has had an ex post facto effect, lengthening his term

3

of imprisonment. (See Brown v. Palmateer, 79 F.3d 1089,
1095-1096 (9th Cir. 2004) (finding ex post facto violation in
application of new parole statute to petitioner because
application of old statute would have resulted in petitioner's
parole; "[i]t can 'be said with assurance' that Brown would
have had a shorter period of incarceration). To prevail on an
ex post facto challenge, a prisoner need not show definitively
that he would have received a shorter period of incarceration
had the Governor not been authorized to reverse the parole
date set by the Board. Even aside from Petitioner's particular
case statistics show that the implementation of Article V,
Section 8 (b) has resulted in a significant risk" of longer
periods of incarceration. Between 1995 and 2004 the Board
found suitable for parole an average of less than 2.5 percent
of prisoners convicted of second-degree murder who came before
the Board for parole consideration. Of the cases from the 2.5
percent that went to the Governor during that period, an
average of 65 percent were reversed. [1] It is clear that two
thirds chance of having one's release date reversed by the
Governor is a "significant risk of increased punishment. If
one decision maker (the Board) applies a rule of suitability
that creates a class of more than 100 candidates and another
decision maker (the Governor) rejects two-thirds or more of
that same class as unqualified for release, it cannot
reasonably be maintained that both decision makers are

1. Statistics produced in October 2005 by the state in Willard
   v. Runnels, Case No. CIV S-04-743 FDC DAD P. Although these
   statistics show the rate of paroles to second degree
   murderers, it can be concluded that first degree murder
   releases are even at a lower rate.

4

applying the same standard; or that one decision maker's (the Governor) reasoning is more rational, as opposed to the other decision maker's, (the Board) which consists of atleast eleven rational minds. (the full Board consists of 17 members, if all positions are filled.)

Furthermore, In In re Rosenkrantz, 29 Cal.4th 616 (2000), one member of the majority candidly admitted that "if the **Garner/Morales** test applies Proposition 89 probably fails... [because] certainly the evidence drawn from Proposition 89's practical implementation demonstrates that the law s retroactive application has resulted in longer period of incarceration." 29 Cal.4th at 687 (Werdeger, J. concurring).

In Garner v. Jones, (200) 529 U.s. 244, 253 the question was whether a procedural change in the way parole decision are made violate the ex post facto prohibition. The High Court stated that although the grant of parole is discretionary "[r]etroactive changes in laws governing parole of prisoners in some instances," may impermissibly increase punishment for a crime after its commission. (Id. at p. 250)

Under Proposition 89 the Governor is constitutionally authorized to render an independent parole authorities and conduct separate parole proceedings the Governor, when reaching his decision, is able to rely upon factors not discussed during the parole hearing$^5$ before the Board and/or evidence considered irrelevant by the Board when making their determination of parole suitability. (In re Rosenkrantz, (2002) 29 Cal.4th at 669-670)

Proposition 89 has rendered the parole process more

5

onerous; Petitioner would have been released from prison upon the finding of suitability of the parole Board, but for Article V, 8 (b). (See Martin, U.S. at 257-258, 144 Ed.2d 247 119 S.Ct. 1998 [quoting Langraph, 511 U.S. at 270 128 L.Ed.2d 229 114 S.Ct. 1483]).

Moreover, the governor has never reversed a finding of parole unsuitability by the Board which indicates that Article V, Section 8 (b) of the California Constitution is not a neutral law, but instead only increase the risk of prolonging a parole applicants incarceration. Retroactive application of Article V, Section 8 (b) to effectuate what it was designed to do - block parole for convicted murders - violates the prohibition against ex post facto laws.

## CONTENTION

### II.

#### PETITIONER WAS DENIED HIS STATE AND FEDERAL DUE PROCESS WHEN THE GOVERNOR'S DECISION WAS NOT BASED ON SAME EVIDENCE RELIED ON BY THE BOARD

On June 6, 2007, Governor Arnold Shwarzennegar reversed Petitioner's grant of parole. The evidence relied on by the Governor consisted of what is termed as an 'Executive Case Summary' file, of which Petitioner did not receive of copy of.

Under California law the Governor is required to consider the same factors as the Board. California Penal Code § 3041 (b); CCR Title 15 § 2402. The Fifth and Fourteenth Amendments prohibit the government form depriving an inmate of life, liberty, or property without due process of law. Wolf v. McDonnell, 418 U.S. 59, 558 (1974) ([The Due Process Clauses are designed to protect the individual against

6

arbitrary government actions.].) Petitioner, a California term-to-life prisoner was not given the opportunity to be heard as required by the Due process Clause. Due Process's minimum safeguards must be provided. These procedural requirements include, (1) at least a twenty-four hour advance written notice of the hearing on the claims being reviewed; (2) a qualified right to an opportunity to be heard, including calling witnesses and presenting evidence in his or her defense; and (3) a written statement by the factfinder detailing the evidence relied upon to reverse the grant of parole. (Meeks v. McBride, 81 F.3d 717, 720 (7th Cir. 1990) 7 due process violated when inmate denied opportunity to present exculpatory evidence directly undercutting reliability of evidence factfinder relied upon].) Prisoners having their parole dates reversed by the Governor are not only not afforded such safeguards, but also, such prisoners are not provided with the evidence (Executive Case Summary file) that the Governor relies on to make his determination.

The evidence supporting the basis of the Governor's decision may rest upon different grounds than the evidence supporting the basis of the Board's decision. Therefore, under Proposition 89 parole applicants are not afforded the opportunity to be heard which violates minimal due process requirements enunciated by the U.S. Supreme Court in Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442  U.S. 1 60 L.Ed.2d 668, 99 S.Ct. 2100. Under Greenholtz.

In a recent decision by the California Court of Appeals,

7

for the First Appellate District in In re Elkins, (2006) 144 Cal.App.4th 475
the Elkins court ordered the Executive Case Summary (ESC) divulged to Elkins
because of the likelihood the Governor would rely on the document and their
concern for Elkin's due process interest in ascertaining its factual basis.
Petitioner requested a copy of the ESC, the Governor's office responded stating
that it was exempt from divulging such information. However, the Governor[1]
admitted that he used the ECS to reverse the decision. Exhibit "C" The court in
In re Arafiles concluded that the "' review'" authorized by Article V, section
8, subdivision (b) of the California Constitution and section 3041.2 of Penal
Code "is confined to a reexamination and consideration of the administrative
record before the ⌈Board]." (In re Arafiles, 6.Cal.App.4th at p.1478).
Petitioner is not able to adequately prepare without knowing what was used by
the Governor deny him parole.

Under the California parole scheme applicants appear before the
Governor with a heightened liberty interest in parole but are afforded
absolutely no due process protection. (See California Code of Regulations Title
15 (CCR Title 15) §§ 2400-2411, and the California Penal Code § 3041.1) This is
exactly what concerned the Elkins, court when it ordered the ECS divulged,
because of the likelihood the Governor would rely on the document to deny
parole, which he admitted he did, Blatantly denying Petitioner his process due.

## CONTENTION

### II.

#### THE GOVERNOR'S DECISION TO REVERSE PETITIONER'S FINDING OF SUITABILITY FALLS SHORT OF THE "SOME EVIDENCE" STANDARD AND VIOLATES PETITIONER'S STATE AND FEDERAL DUE PROCESS OF LAW

On January 23, 2007, Petitioner was found suitable for

---

1. The Governor does not actually personally answer legal
corespondance, therefore his legal affairs department
answers on his behalf.

8

parole. Exhibit "A" p. 80 (decision portion of the hearing transcripts). On June 6, 2007 Governor Arnold Shwazennegar reversed Petitioner's parole suitability. In his decision to reverse the grant of parole, the Governor stated the following:

Despite the positive factors I considered, the first-degree murder for which Jesse Reed was convicted was especially atrocious because it was carried out in a dispassionate and calculated manner.

(Exhibit "B" p. 2)

The Governor relied on the unchanging facts of the crime, and Petitioner's own admittance. Petitioner admitted to the offense stating that he intended to kill the victim. Although the offense was unintentional, Petitioner honestly stated that any time someone uses a gun in a robbery, anything can happen, the possibility of something going wrong in the robbery could be fatal. This is exactly what occurred in this instant offense. (See Exhibit "A" p. 9) In In re Elkins, (2006) 144 Cal.App.4th 475, that court noted this very situation, noting that prisoners are reluctant to honestly explain themselves, for fear of being accused of minimizing or not taking full responsibility for their crimes.

The Governor concluded that: "The gravity of the first-degree murder committed by Jesse Reed is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk." The Governor also relied on the opposition from the Alameda County District Attorney's Office and the Oakland Police Department, to deny parole. The California Supreme Court and federal courts have

9

recognized that parole applicants posses a "protected liberty interest under the California Due Process Clause." In In re Rosenkrantz, supra, 29 Cal.4th at 660; cf. McQuillion v. Duncan, (9th Cir. 2002) 306 F.3d 895, 901 ⌜prisoner already granted parole has a heightened liberty interest and a specific expectation of being released]. Courts may review and must reverse those decision that lack "some evidence" in the record to support them (Rosenkrantz, supra, at 667) In re Smith, 109 Cal.App.4th 489; In re Capistran, (2003) 107 Cal.App.4th 1299 1305; In re Ramirez, (200 ) 94 Cal.4th 549, 564)   .

Under California law, a parole release date must be set unless the panel determines that the "gravity of the current or convicted offense or offenses is such that consideration of public safety requires a more lengthy period of incarceration. ." Cal. Penal Code § 3041 (b). The panel must determine "whether the life prisoner will pose an unreasonable risk of danger to society if released from prison." CCR Title 15 § 2402 (a) The Panel must consider "all relevant, reliable information," and is guided by circumstances tending to show suitability and unsuitability for parole. Id. § 2402 (b)-(d). The Governor is required to consider the same factors as the Board. Cal. Penal Code 3041 (b); CCR Title 15 § 2402.

There is no question that the only basis for finding a life prisoner unsuitable for parole is that he presents a current threat to public safety  When the Board or the Governor make findings that a prisoner is unsuitable for parole, they give reasons to support that finding. Those

10

reasons may include the aggravated nature of the commitment
offense, the prisoner's criminal history, his institutional
behavior and programming, the evaluation of a psychologist
report, the viability of parole plans, or other issues. Any
reason given, however, is legally relevant only insofar as it
is evidence of current threat to public safety, for that is
the only basis upon which parole may be denied.

     A review of the record for sufficient evidence is thus a
two-step process. The first step is to review the reasons
given by the Board or the Governor to determine whether the
evidence, supports those reasons. The second, and critical
step is to then review whether the reasons, if supported by
the evidence, constitutes evidence that the prisoner is a
current threat to public safety. It may be obvious that some
reasons constitute evidence that the prisoner is a current
threat to public safety, for example, recent prison
disciplinary history for violence or ongoing substance abuse.

     The Governor relied solely on the commitment offense to
reverse Petitioner parole stating that the gravity of the
commitment offense alone is sufficient for him to conclude the
Petitioner is still poses an unreasonable public safety
risk. In In re Dannenberg, 34 Cal.4th at p. 1080 that court
held that finding a prisoner unsuitable for parole, the Board
may rely solely upon the circumstances of the crime. The
Danneberg court however, recognized that reliance upon the
circumstances of the prisoner's offense alone might contravene
the inmate's constitutionally protected expectation of parole.
(quoting Rosenkrantz, supra 29 Cal. at p. 683, the court

11

explained "[S]uch a violation could occur, 'for example[,]
where no circumstance of the of the offense reasonable could
be considered more aggravated or violent than the minimum
necessary to sustain a conviction for that offense.'
[Citation] .. [I]n order to prevent the parole authority's
case-by case suitability determinations from swallowing the
rule that parole should 'normally' be granted, an offense must
be particularly egregious to justify the denial of parole
(Dannenberg, supra, 34 Cal.4th at pp. 1094-1095.) Dannenberg
stated that the court's "use of the phrase 'particularly
egregious.' conveyed only that the violence or viciousness of
the inmate's crime must be more than minimally necessary to
convict him of the offense for which he is confined." (Id. at
1095.) It is clear that Petitioner did not use more than the
necessary force to convict him for first degree murder.

## A. THE CONTINUED RELIANCE ON IMMUTABLE FACTORS TO DENY PAROLE VIOLATES DUE PROCESS

The commitment offense is only one of two immutable
factors to be considered for denial of parole, the other being
a prisoners past criminal history. In the instant cause of
action the Governor only relied on the commitment offense to
deny parole. In a recent decision by the California Court of
Appeals, Second District, in In re Sandra Lawrence, 59
Cal.Rptr. 537, after rejecting most of the Governor's reasons
for reversing Lawrence's grant of parole, turned to the
remaining factor used to reverse parole. The Lawrence court
held that Lawrence's offense was not committed with more
lethality than most of the following murders which its fellow

12

appellate courts also found that they failed as "some
evidence" to support the board or the Governor's denial of
parole.

In In re Smith, (2003) 109 Cal.App.4th at pp  492-493,
Smith was a drug dealer convicted for his role in the
shooting, beating, and drowning of another drug dealer some 15
years before the grant of parole the Governor had reversed.

In In re Scott, (2005) 133 Cal.App.4th at p. 579. Scott,
in a rage, drove to his wife's lover's house and shot him in
the head with a rifle.

In In re Lee, (2006) 143 Cal.App.4th p. 1404, Lee,
seeking to collect on a business debt brought a gun and a box
of bullets along to a meeting, and when refused payment, fired
five times, wounding the debtor but killed the debtor's wife.

In In re Weider, (2006) 145 Cal.App.4th at p. 575-576,
Weider, another distraught husband, took a gun into a public
restaurant and fired twice at the man who had been living with
his estranged wife for two years. Weider killed the man and
wounded two restaurant patrons, one fatally.

In In re Elkins, (2006) 144 Cal.App.4th at pp. 480-481,
Elkins, in order to rob a sleeping friend, struck the victim
with a baseball bat then pummeled him to death with that bat,
drove the body into the wilderness and dumped it down a remote
embankment, stole more of the victims belongings from a
storage locker, and fled the state.

In Rosenkrantz v. Marshall, 444 F.Supp.2d at p. 1065;
Rosenkrantz shot a friend of his brother for outing him as a
homosexual. Prior to shooting his victim Rosenkrantz acquired

13

an automatic weapon, planned and even rehearsed the shooting before stalking and blasting his victim with a fusillade from the gun.

In Martin v. Marshall, (C.D. 2006) 444 F.Supp.2d 1038, '040, Marshall a drug user shot and killed his drug dealer whom he owed money to. Martin also shot two other innocent restaurant patrons, killing one of the patrons.

In Lawrence, supra, Lawrence shot her lover's wife four times and stabbed her with a potato peeler.

It is clear that Petitioner did not commit this offense with more than the minimal force necessary to convict him of this offense. The California Appellate Court in Scott, supra, held that the commitment offense is one of only two immutable factors that will never change. The Scott court further echoed a federal court finding that "[R]eliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair, and runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' (See Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 915). The Scott court went on to hold that the predictive value of the commitment offense may be very questionable after a long period of time. **"Thus, denial of release based solely on the basis of the gravity of the commitment offense warrants especially close scrutiny."** In Irons v. Carey, 358 F.Supp.2d 936 found that the Board had relied on the commitment offense four prior times, and that under those circumstances continued reliance on those factors at his 2001 (4th suitability hearing) violated Irons due

14

process. The Irons Court further held that "continuous

reliance on unchanging circumstances transforms an offense for

which California law provides eligibility for parole into a de

facto life imprisonment without the possibility of parole."

Irons, supra, at 947.

## B. THE PREDICTIVE VALUE OF THE COMMITMENT OFFENSE AFTER 20 YEARS DISSIPATES.

Petitioner committed this offense over 20 years ago

In an unpublished opinion, the Sixth Appellate District

for California quoted in In re Wieder, 145 Cal.App.4th 470 The

court noted that Weider:

"has served so much time that, with custody credits,
he is within the matrix for first degree murder. .
[I]t should be self evident that after an inmate has
served the equivalent of 25 years, whether his actions
were more than the minimally necessary for a second
degree conviction... is no longer the appropriate
question. [The Board's] position, that inmates who
were convicted of second degree may forever be
denied parole based on some modicum of evidence
that their acts rose to the level of a first,
without acknowledging the fact that they have
already served the time for a first, should be
seen as so ridiculous that simply to state it is
to refute it."

(See In re Wieder, 145 Cal.App.4th 470, 479 (2006).

In Lawrence, supra, the Lawrence court stated:

Thus, if as some of the federal cases hold the
predicitive value of the commitment crime dissipates
to the point it cannot satisfy the "some evidence"
standard 17 to 20 years after its commission, a
foriori it has lost all its predictive steam over
a third of century  after it was committed and
nearly a quarter century into the prisoner's
incarceration.

(In re Lawrence, supra)

In Willis v. Kane, 485 F.Supp 2d 1126, 1135 that court

held that although Willis's offense was a terrible crime; "The

15

facts of that crime will be just as terrible 20 years from today
as they are today and as they were 20 years ago." The Willis
court found that there was no evidence to support the claim
that Willis was still a threat to the public 20 years later.
The Willis court further state:

> Willis' case is the kind of case Biggs and Irons
> cautioned about: "the continued reliance on the
> immutable events of the crime to deny parole for
> present dangerousness despite the candidate's
> exemplary behavior in prison, favorable current
> psychological reports, and the absence of any other
> violence or criminal record.

(Willis v. Kane, supra at 1135).

Petitioner has served over 23 years, 29 years with good
time credit applied. The Governor's claim that he can rely on
the commitment offense alone to reverse parole is not totally
accurate. the Governor may rely on the crime alone, when there's
is evidence in the record that rationally indicate that
Petitioner poses a threat to public safety. There is absolutely
no evidence that petitioner is still a threat to public safety.

## CONTENTION

### III.

### THE SUPERIOR COURT DECISION WAS AN UNREASONABLE DETERMINATION OF THE FACTS; AND AN UNREASONABLE DETERMINATION OF STATE AND FEDERAL LAW, THEREBY VIOLATING PETITIONER'S DUE PROCESS

On January 25, Petitioner received a denial of his habeas
petition claims by the superior court. Exhibit "D" The superior
court decision was an unreasonable determination of state and
federal law, thereby violating Petitioner's due process. The
superior court found that the Board used the immutable factor
to justify their denial of parole. (Exhibit "D" p. 6) The

16

superior court then stated that Petitioner did not offer any binding authority The superior court is just plain wrong, Petitioner offered several cases to substantiate his claims.

Recently, In another recent decision in In re Dannenberg, Case No. H03003 (11/16/07), the Dannenberg Court pointed to In re Jacobson, (2007) 154 Cal.App.4th 849, stating: "Jacobson held that a parole unsuitability decision must be upheld so long as some evidence supports a finding that the offense was "especially heinous" without regard to whether there is a nexus between this finding and a conclusion that the prisoner currently poses an unreasonable risk of danger to society if released. We reject this criticism of Scott, Lee, and Elkins. (See In re Dannenberg, supra, at p. 12-13). Recently, the United States Court of Appeals for the Ninth Circuit held that the very same factors the Board and the superior court upheld in this instant action, were over several years (50) ago and did not support the decision that he still posed a threat to society. See Exhibit "E" (RONALD HAYWARD V. JOHN MARSHALL, Case No. 06-55392 (2008) * 24).

In another recent decision in In re Dannenberg, Case No. H03003 (11/16/07), the Dannenberg Court pointed to In re Jacobson, (2007) 154 Cal.App.4th 849, stating: "Jacobson held that a parole unsuitability decision must be upheld so long as some evidence supports a finding that the offense was "especially heinous" without regard to whether there is a nexus between this finding and a conclusion that the prisoner currently poses an unreasonable risk of danger to society if released.

17

We reject this criticism of Scott, Lee, and Elkins.(See In re Dannenberg, supra, at p. 12-13).

Furthermore, if the circumstances of Petitioner's offense and past criminal and social behavior can be used after over 23 years to deny him parole, even though those factors do not provide evidence that Petitioner still poses a threat to public safety.

The superior court further held that because the commitment offense occurred in during the commission of a robbery, the Governor could use the special circumstance allegations as "some evidence" to determine that the offense was particularly egregious. However, the U.S Supreme Court recently held that any allegations used to convict must be found true by a jury in order to be used to deny parole (See Cunningham v. Calfornia, 549 U.S. ____ (2007).) The Court in In re Elkins, 144 Cal.App.4th held that the elements of the robbery did not constitute an atrocious and heinous offense. Petitioner's offense fails in comparison to Elkins in the objective in both offenses was robbery.

Furthermore, the superior court erroneously held that the Governor's use of the Executive Case Summary (ECS) prepared by his legal staff without providing Petitioner without a copy or an opportunity to review the same evidence the Governor reviewed violated Petitioner's due process. Furthermore, the Governor is only to review the same evidence the Board reviewed, not additional information.

Dated this 2ND day of June 2008.

Jesse L. Reed
**In Pro Se**

18

EXHIBIT   "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

RECORDS COPY

In the matter of the Life )
Term Parole Consideration )      CDC Number D-07717
Hearing of:               )
                          )
JESSE REED                )
_____)

CALIFORNIA STATE PRISON

SAN QUENTIN

JANUARY 23, 2007

8:40 A.M.

PANEL PRESENT:

Linda Shelton, Presiding Commissioner
Deborah Star, Deputy Commissioner

OTHERS PRESENT:

Jesse Reed, Inmate
Charles Carbone, Attorney for Inmate
David Lim, Deputy District Attorney
Patricia Fox, Observer
Correctional Officer Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

**Kerry Viens    Northern California Court Reporters**

ii

INDEX

Page

Proceedings .................................................1

Case Factors ...............................................7

Pre-Commitment Factors ....................................15

Post-Commitment Factors ...................................26

Parole Plans ..............................................38

Closing Statements ........................................65

Recess ....................................................79

Decision ..................................................80

Adjournment ...............................................96

Transcriber Certification .................................97

--oOo--

1

1                           P R O C E E D I N G S

2              **PRESIDING COMMISSIONER SHELTON:**  All right.

3       Good morning everyone.  We are here for the third

4       subsequent parole consideration hearing for Jesse Reed,

5       R-E-E-D, CDC number D as in David 07717.  Today's date

6       is January 23rd, 2007.  The time is 8:40 a.m., and we

7       are located at San Quentin.  Mr. Reed was received on

8       January 5th, 1985, committed from Alameda County.  His

9       life term began January 15th, 1986, and he has a

10      minimum eligible parole date of October 23rd, 2001.

11      The controlling offense for which Mr. Reed is committed

12      is set forth in case number 80260 A, charging Count 1,

13      violation PC 187, murder in the first degree, with the

14      use of a firearm 12022.5 PC.  Mr. Reed received a term

15      of 25 plus two years enhancements, totaling 27 years to

16      life.  All right.  Mr. Reed, we are being taped, so we

17      are going to go around the room and introduce

18      ourselves, and everyone, please say your first name,

19      your last name, spell your last names.  And, Mr. Reed,

20      when we get to you, please add your CDC number.  My

21      name is Linda Shelton, S-H-E-L-T-O-N, Commissioner.

22             **DEPUTY COMMISSIONER STAR:**  Deborah Star, S-T-A-

23      R, Deputy Commissioner.

24             **DEPUTY DISTRICT ATTORNEY LIM:**  David Lim, L-I-

25      M, as in Mary, with Alameda County District Attorney's

26      office.

27             **ATTORNEY CARBONE:**  Good morning, Commissioners,

2

1   Charles Carbone, C-A-R-B-O-N-E, and I am counsel to Mr.

2   Reed.

3        **INMATE REED:** Good morning. Jesse Reed, R-E-E-

4   D, CDC number D-07717.

5        **MS. FOX:** Patricia Fox, F-O-X, here to observe.

6        **PRESIDING COMMISSIONER SHELTON:** Thank you.

7   And we have two officers in the room for security

8   purposes who will not be participating in today's

9   hearing. All right. Mr. Reed, let's take care of some

10  ADA issues if any. You signed your BPT form 1073 on

11  September 18th, 2006, and did not indicate any

12  disabilities. Is that still true?

13       **INMATE REED:** It's true.

14       **PRESIDING COMMISSIONER SHELTON:** All right.

15  Let me ask you a couple of questions just to verify.

16  You're not wearing any glasses. Do you traditionally

17  wear glasses?

18       **INMATE REED:** Sometimes when I read. When I

19  read, I have glasses, yeah.

20       **PRESIDING COMMISSIONER SHELTON:** Did you bring

21  those with you?

22       **INMATE REED:** No, I didn't. I didn't. I left

23  them at work.

24       **PRESIDING COMMISSIONER SHELTON:** Okay. If you

25  need to read anything that you can't, then we'll ask

26  your attorney to help you with that all right?

27       **INMATE REED:** All right.

3

1      **PRESIDING COMMISSIONER SHELTON:**    How about

2      hearing, is that okay?

3              **INMATE REED:**    Fine.

4      **PRESIDING COMMISSIONER SHELTON:**    Mobility?

5      Sitting?  Standing?  Walking?  You're comfortable?

6              **INMATE REED:**    Fine.

7      **PRESIDING COMMISSIONER SHELTON:**    Are you on any

8      medication, sir?

9              **INMATE REED:**    Just high blood pressure

10     medication.

11     **PRESIDING COMMISSIONER SHELTON:**    And that

12     doesn't interfere with your thinking or --

13             **INMATE REED:**    No.

14     **PRESIDING COMMISSIONER SHELTON:**    -- make your

15     brain all fuzzy or anything?

16             **INMATE REED:**    No.

17     **PRESIDING COMMISSIONER SHELTON:**    Okay.  All

18     right.  Counsel, would you concur that Mr. Reed has

19     really no disabilities that need accommodating at this

20     time?

21             **ATTORNEY CARBONE:**    Indeed.  I so concur.

22     **PRESIDING COMMISSIONER SHELTON:**    All right.  I

23     know you've been with us before, but I would like to

24     remind you of your rights.  These rights include the

25     right to a timely notice of this hearing.  The right to

26     review your Central File, which, according to my

27     records, you did review on October 30th, 2006.

4

1    **INMATE REED:** Yes, I did.

2    **PRESIDING COMMISSIONER SHELTON:** Excellent.

3    And you have the right to present relevant documents.

4    Counsel, have your client's rights been met so far?

5    **ATTORNEY CARBONE:** They have, indeed. And when

6    it is appropriate, at the opportune time, we do have

7    some additional documents that we would like to submit.

8    **PRESIDING COMMISSIONER SHELTON:** Terrific. Mr.

9    Reed. You also have the right to an impartial Panel.

10   And, today, your Panel would be Commissioner Star and

11   myself. Is that all right with you?

12   **INMATE REED:** Yes, it is.

13   **PRESIDING COMMISSIONER SHELTON:** Okay. And

14   finally, with regards to rights, the rules have charged

15   with regards to appealing a decision.

16   **INMATE REED:** Okay.

17   **PRESIDING COMMISSIONER SHELTON:** And evidently,

18   I understand that they're changing again. So, if there

19   is any information that you need with regards to that,

20   consult with your attorney. Okay?

21   **INMATE REED:** Okay.

22   **PRESIDING COMMISSIONER SHELTON:** Now, sir, you

23   now you are not required to admit to or discuss your

24   offense. However, this Panel does accept as true the

25   findings of the court. Tell me what that means.

26   **INMATE REED:** It means that whatever the court

27   said is what you find to be true.

5

1       **PRESIDING COMMISSIONER SHELTON:**  Basically the

2    court found you guilty of murder in the first degree.

3    We are not here to retry your case.  We are here to

4    discuss your suitability for parole.  All right.

5    Commissioner, do you have any confidential information?

6       **DEPUTY COMMISSIONER STAR:**  There is

7    confidential information in the file; but, we will not

8    be using it.

9       **PRESIDING COMMISSIONER SHELTON:**  Okay.  Great.

10   Thank you.  And I would like to say I passed the

11   hearing checklist around to everybody, but we don't

12   have one.  And I haven't found any in any of the files

13   here.

14      **DEPUTY COMMISSIONER STAR:**  I have one in mine.

15      **PRESIDING COMMISSIONER SHELTON:**  You have one.

16   Wonderful.  Then why don't we go ahead, and we'll have

17   both Mr. Lim and Mr. Carbone take a look at the hearing

18   checklist to make sure all the documents they need,

19   they have to move forward.

20      **ATTORNEY CARBONE:**  I have before me,

21   Commissioner, perhaps what will be marked as Exhibit

22   Number 1, the hearing checklist, and we do indeed have

23   all of those documents.

24      **PRESIDING COMMISSIONER SHELTON:**  All right.

25   Thank you.

26      **DEPUTY DISTRICT ATTORNEY LIM:**  I have them all

27   as well.

6

1    **PRESIDING COMMISSIONER SHELTON:** All right.
2    Thank you. Both Mr. Lim and Mr. Carbone have verified
3    they have the necessary documents to move forward, so
4    we will. Okay. Mr. Carbone, you indicated you had
5    some additional documents to be submitted.

6    **ATTORNEY CARBONE:** We do indeed, and I've tried
7    to arrange them by topic. The first documents that we
8    shall be submitting this morning relate to job offers,
9    three job offers in particular, and that information
10   may not already be a part of the packet. The second
11   grouping relates to some recently participated self-
12   help related programs, and perhaps the Deputy
13   Commissioner is the best to review those documents.
14   And, then, finally, some additional letters of support,
15   which may not be included in the (inaudible).

16   **PRESIDING COMMISSIONER SHELTON:** Okay.
17   Terrific. And what we'll do is we'll go through these,
18   the documents you gave me we'll review during parole
19   plans, and if anything should come up during the course
20   of the hearing, I'm not adverse to accepting it,
21   especially since you reviewed your C-File, and if you
22   should note something being left out, please let us
23   know.

24   **ATTORNEY CARBONE:** Thank you, Commissioner.
25   **PRESIDING COMMISSIONER SHELTON:** All right.
26   Are there any preliminary objections?

27   **ATTORNEY CARBONE:** None whatsoever.

7

1          **PRESIDING COMMISSIONER SHELTON:** And will your
2     client be speaking with us today?

3          **ATTORNEY CARBONE:** In all respects, thank you.
4          **PRESIDING COMMISSIONER SHELTON:** Okay. Please
5     raise your right hand. Do you solemnly swear or affirm
6     that the testimony that you give at this hearing will
7     be the truth, the whole truth, and nothing but the
8     truth.

9          **INMATE REED:** I do.

10         **PRESIDING COMMISSIONER SHELTON:** Thank you.
11    All right. Let's move forward. I'm going to enter
12    into the record the summary of the commitment offense
13    as taken from the January 2007 Board report. I didn't
14    find any appellate ruling, so I will go with this, and
15    then we'll open it up to you, Mr. Reed, for questions.
16    All right.

17              "During the early morning hours of
18              October 25th, 1984, Jesse Reed and his
19              brother Gregory Reed went out with the
20              intent to rob either a prostitute or the
21              customer of a prostitute. They spotted a
22              prostitute getting into a truck with the
23              victim, Joe Bates. Jesse and brother
24              approached the truck, and Jesse opened
25              the driver's door and, with the revolver
26              pointed at Joe Bates, demanded money.
27              Bates told Jesse that he had no money and

8

| | |
|---|---|
| 1 | begged Jesse not to shoot him.  The |
| 2 | prostitute attempted to hand Jesse a $20 |
| 3 | bill but dropped it.  Jesse then shot |
| 4 | Bates in the heart.  Bates died that same |
| 5 | morning at Merit Hospital." |

6       Okay.  Mr. Reed, why don't you tell us what
7   happened?

8       **INMATE REED:**  The summary is pretty accurate.
9   On the morning of October 25th, 1984, well, earlier
10  that day, I had been drinking and spent a lot of time
11  drinking, using drugs, smoking cocaine and snorting
12  heroin.  Later on that evening, my brother and I set
13  out to get more money because we had run out of money
14  to get some more drugs, and we went out and we spotted
15  a guy who was picking up a prostitute, and we felt
16  that -- I thought that he would be an easy victim, an
17  easy victim.  And he, to me, he was brought over and I
18  didn't really want any problems.  I just wanted to get
19  the money and go get us some more drugs.  And I went to
20  the truck.  I had taken a gun with me, a .22 revolver
21  and to scare Mr. Bates, I opened the car, the truck
22  door.  I cocked the hammer back on the gun to scare
23  him, to say to him that I wasn't playing and that we
24  wanted the money.  And I asked him for the money, and
25  he said, 'Don't shoot.'  I don't really recall the
26  prostitute trying to hand me over the $20.  Everything
27  was happening really fast, and I was nervous and afraid

9

1  myself because I knew that what was I was doing was

2  wrong.  I knew that there was a possibility that the

3  police could turn the corner at any time and I, in the

4  excitement of everything going on, I pulled the trigger

5  and shot Mr. Bates.  I --

6      **PRESIDING COMMISSIONER SHELTON:**  Then what did

7  you do?

8      **INMATE REED:**  I stood there and just looked at

9  him.  He slumped over the steering wheel.  I just took

10  off running.  I just ran.  I have continued all along

11  over the years that I didn't intend to kill Mr. Bates,

12  but I know today that -- that the intent I did intend

13  to kill him.  I intended this whole thing to happen

14  because when I picked up a loaded firearm and went out

15  and pointed it at him, at another human being, I

16  intended very much to harm him, to -- anything could

17  happen during that time.  I was high.  I wasn't in my

18  right state of mind, frame of thought, and anything

19  could have happened in an instant.  I mean, anything

20  could have happened, and it did.  Everything went

21  wrong.  All I can think about at the time was just

22  getting away.

23      **PRESIDING COMMISSIONER SHELTON:**  Where'd you

24  go?

25      **INMATE REED:**  We went back to my apartment, and

26  that's where we stayed.

27      **PRESIDING COMMISSIONER SHELTON:**  Did you turn

10

1   yourself in, or were you arrested?

2        **INMATE REED:** I was arrested a week later.

3        **PRESIDING COMMISSIONER SHELTON:** A week later.

4   And what did you do during that week?

5        **INMATE REED:** During that week, got high,

6   drink, and use drugs all week long.

7        **PRESIDING COMMISSIONER SHELTON:** What did you

8   think about the victim during that week?

9        **INMATE REED:** I didn't. I -- my sister read

10  about it in the newspaper the next morning, and the

11  only thing I wanted to do was just get high. I didn't

12  want to think about it. I didn't want to think about

13  it. I just wanted to get drunk and use as much drugs

14  as I could.

15       **PRESIDING COMMISSIONER SHELTON:** Where'd you

16  get the gun?

17       **INMATE REED:** A friend of mine left it with me.

18       **PRESIDING COMMISSIONER SHELTON:** How long had

19  you had it?

20       **INMATE REED:** Earlier that day. Earlier that

21  day.

22       **PRESIDING COMMISSIONER SHELTON:** And why did he

23  leave it to you?

24       **INMATE REED:** He went to do something in East

25  Oakland, and he came by and said I'm going to leave

26  this here, leave it with you, and I'll be back later on

27  this evening to pick it up. I don't know exactly -- I

11

1    don't recall.

2        **PRESIDING COMMISSIONER SHELTON:**  When you

3    were -- you and your brother were contemplating doing

4    this robbery for money for drugs, having the gun, did

5    that give you courage to proceed?

6        **INMATE REED:**  Yes, it did.  Yes, it did.

7    Having a gun caused more fear, and I knew that, so,

8    yeah, the purpose was to scare, to make him give up the

9    money.

10       **PRESIDING COMMISSIONER SHELTON:**  Let's talk

11   about your substance abuse for a moment.  How old were

12   you when you started involving yourself with the use of

13   drugs?

14       **INMATE REED:**  I started drinking when I was 17.

15   17, 18, something like that.  Drugs, I started at 18.

16   I was at Laney College.  With Laney College I was a

17   football -- I played football.  And we would have these

18   parties after the games, Friday evenings, and they

19   would have all kind of drugs there, and I got involved

20   in trying this and trying that, and I just got worse

21   and worse over, time.  It started when I was about 18

22   in college.

23       **PRESIDING COMMISSIONER SHELTON:**  And your drugs

24   of choice were cocaine and heroin?

25       **INMATE REED:**  Right.  Right.

26       **PRESIDING COMMISSIONER SHELTON:**  Okay.

27       **INMATE REED:**  The -- my drug of choice was

12

1    alcohol. I got into using cocaine because it allowed

2    me to drink more without getting, getting just sloppy

3    drunk. It allowed me to just have an upper and a

4    downer, and I wouldn't get just totally blackout drunk

5    when I was using cocaine.

6         **PRESIDING COMMISSIONER SHELTON:** Did your

7    brother get arrested for this offense as well?

8         **INMATE REED:** Yes, he did.

9         **PRESIDING COMMISSIONER SHELTON:** And where is

10   he now?

11        **INMATE REED:** He's in Solano.

12        **PRESIDING COMMISSIONER SHELTON:** Did he receive

13   murder first?

14        **INMATE REED:** Yes.

15        **PRESIDING COMMISSIONER SHELTON:** Do you have

16   contact with him?

17        **INMATE REED:** Yes, we, through my mother and my

18   aunt, sometimes his wife.

19        **PRESIDING COMMISSIONER SHELTON:** Who was the

20   third person that was with you?

21        **INMATE REED:** The third person was Harvey H.

22   He was a guy I had met who was in the military and had

23   just gotten out of the military, and he drove an ice

24   cream truck in the Benicia, Vallejo area.

25        **PRESIDING COMMISSIONER SHELTON:** Did he get

26   arrested as well?

27        **INMATE REED:** Yes, he did. Yes, he did.

13

1        **PRESIDING COMMISSIONER SHELTON:** And where is
2    he?

3        **INMATE REED:** He's at home. He was found not
4    guilty.

5        **PRESIDING COMMISSIONER SHELTON:** Okay.
6    Commissioner, would you like to ask some questions at
7    this time?

8        **DEPUTY COMMISSIONER STAR:** Just a couple, Mr.
9    Reed. You told the Commissioner that you, a friend
10    dropped off the gun. Had you ever carried a gun prior
11    to this incident?

12        **INMATE REED:** Yes -- yes, I had. In fact, I
13    was arrested for carrying a concealed weapon.

14        **DEPUTY COMMISSIONER STAR:** Had you been
15    carrying the gun since that prior arrest offer -- have
16    you just carried it on these two occasions, or did you
17    always have a gun of your own?

18        **INMATE REED:** No, not always. From time to
19    time I did.

20        **DEPUTY COMMISSIONER STAR:** When the friend left
21    the gun at the house, did you tell the friend you were
22    planning on something that night?

23        **INMATE REED:** No, I didn't. No, I didn't.

24        **DEPUTY COMMISSIONER STAR:** So you just took the
25    gun as an opportunity. He had left it there.

26        **INMATE REED:** Yes.

27        **DEPUTY COMMISSIONER STAR:** Okay. Now, in your

14

1    counselor's report, Mr. Reed, it said: "I just wanted

2    money.  However, by cocking the hammer back on the gun

3    and shaking because I was so afraid, the gun

4    discharged."

5         **INMATE REED:**  Right.

6         **DEPUTY COMMISSIONER STAR:**  Are you saying you

7    felt it went on accidentally out of nervousness or did

8    you feel -- do you recall a deliberate pulling of the

9    trigger?

10        **INMATE REED:**  I -- I don't know today if it was

11   deliberate or if it was an accident.  I knew that I was

12   afraid.  I was shaking.  I was nervous.  I cocked the

13   handle back on the gun and in all the excitement, the

14   gun went off.  Do I recall pulling the trigger today?

15   No, I don't.  I know I did.  And I accept -- I take

16   full responsibility of that.

17        **DEPUTY COMMISSIONER STAR:**  How many shots were

18   fired?

19        **INMATE REED:**  One.

20        **DEPUTY COMMISSIONER STAR:**  Do you recall what

21   the victim was doing at that point that would make you

22   just fire?

23        **INMATE REED:**  He wasn't doing anything.  He

24   had -- he had his hands up.

25        **DEPUTY COMMISSIONER STAR:**  Uh-huh.

26        **INMATE REED:**  And he said, 'Don't shoot.'

27   And --

15

1      **DEPUTY COMMISSIONER STAR:** Would you say he was

2      cooperating then, at that point? Or did you feel he

3      was a threat?

4      **INMATE REED:** No, he certainly wasn't a threat.

5      He certainly wasn't a threat. Like I said, everything

6      was moving so fast, happened so fast. I -- I was high.

7      I wasn't thinking. How recently had you used just

8      prior to this robbery?

9      **INMATE REED:** I had been using all day.

10     **DEPUTY COMMISSIONER STAR:** Okay. What did you

11     do with the gun after the incident?

12     **INMATE REED:** I gave it back to the guy when he

13     came back. I gave it back to him.

14     **DEPUTY COMMISSIONER STAR:** Did they ever locate

15     the gun? Or do you know?

16     **INMATE REED:** No. I told him what happened.

17     He got rid of it.

18     **DEPUTY COMMISSIONER STAR:** Okay. I don't think

19     I have any other questions. Thank you.

20     **PRESIDING COMMISSIONER SHELTON:** We're going to

21     move on. We will have a question time during the

22     course of the hearing. Let's talk about your prior

23     record. I reviewed your CINI record and the Board

24     record, and it appears that you had no juvenile record;

25     is that correct?

26     **INMATE REED:** Yes.

27     **PRESIDING COMMISSIONER SHELTON:** You were

16

1    charged in September of '80 with an attempted robbery,
2    and the charges with dismissed.

3            **INMATE REED:**  Yes.

4            **PRESIDING COMMISSIONER SHELTON:**  Can you tell
5    me what that was about?

6            **INMATE REED:**  That was about a man that I had
7    met at a club.  We had gotten into a argument, fight,
8    and being myself, this guy, and a friends of mine,
9    James, and he worked at (inaudible) and we -- he
10   accused me of a robbery because we had got in a big,
11   big argument as well.  Actually, this was about a week
12   or so after the argument of the club, which was, I
13   think, on a Friday night.  I ended up getting arrested.
14   I -- it was basically because the guy was lying.

15           **PRESIDING COMMISSIONER SHELTON:**  Well, the
16   charges were dismissed.  I was just curious about the
17   circumstances.  In March of '81, you were arrested for
18   disturbing the peace, trespassing, and it says that
19   there were no formal charges.

20           **INMATE REED:**  Right.  I called the police
21   myself in that incident.  I felt that the clerk at the
22   Quarter Pound hamburger establishment, she knew me,
23   and, again, I was drunk, and I called the police, and
24   they arrested me.

25           **PRESIDING COMMISSIONER SHELTON:**  So they ended
26   up dropping those charges as well.  In November of '81,
27   you were charged with a 12025 PC, carrying a concealed

1   weapon.  Tell me about that.  You received 18 months of
2   probation.

3            **INMATE REED:**  Right.

4            **PRESIDING COMMISSIONER SHELTON:**  Is that a
5   court probation?

6            **INMATE REED:**  Yes, it was.

7            **PRESIDING COMMISSIONER SHELTON:**  Why were you
8   carrying a weapon?  What were those circumstances?

9            **INMATE REED:**  I was on the -- I was on the AC
10  transit, and I was trying to sell a gun.  It was a .32
11  revolver, and I was trying to sell it so I could have
12  some money to go and get high.  And this guy that I was
13  showing it to on the bus, when he got to his stop, he
14  just snatched the gun and ran off the bus.  I ran off
15  behind him.  When I caught up with him, we had a
16  scuffle.  The gun, he threw the gun and I let him go
17  and I grabbed it, went to grab the gun, and he went
18  around the corner.  I lost track of him.  I didn't know
19  where he went.  But I went in the store.  There was a
20  store on the corner there, this is out in East Oakland,
21  and I went in to buy a beer, and while I was standing
22  there waiting to buy the beer, the Oakland police came
23  in and told me to get on the ground, and then I found
24  out later that the guy's relatives owned the store and
25  he was there and they had called the police, so I was
26  arrested.

27           **PRESIDING COMMISSIONER SHELTON:**  Did I leave

18

1   anything out or miss anything that we should cover

2   during your prior record?

3           **INMATE REED:**  I think that's about it really.

4   I was arrested for drunk driving one time (inaudible).

5           **PRESIDING COMMISSIONER SHELTON:**  No, I don't.

6   But I appreciate you telling me.  I think I read it

7   somewhere in the body of your probation report.  When

8   were you arrested for drunk driving?

9           **INMATE REED:**  Oh, I don't know.

10          **PRESIDING COMMISSIONER SHELTON:**  A long time

11  ago?

12          **INMATE REED:**  It was a long time ago, yeah.

13          **PRESIDING COMMISSIONER SHELTON:**  Were you a

14  kid?  Under 18?

15          **INMATE REED:**  No.  I was over 18.

16          **PRESIDING COMMISSIONER SHELTON:**  Okay.  Let's

17  talk about your social history.  First of all, I want

18  to verify that your birth date is 12/17/59.

19          **INMATE REED:**  Right.

20          **PRESIDING COMMISSIONER SHELTON:**  You were 24 at

21  the time of this commitment offense.

22          **INMATE REED:**  24, that's right.

23          **PRESIDING COMMISSIONER SHELTON:**  And you are

24  currently 47 right now.

25          **INMATE REED:**  Right.

26          **PRESIDING COMMISSIONER SHELTON:**  You were born

27  in Texarkana, Arkansas?

19

1        **INMATE REED:**   That's right.

2        **PRESIDING COMMISSIONER SHELTON:**   And your

3    father's name was Willy Parks, your mother's name Lois

4    Reed.   You took your mother's name?

5        **INMATE REED:**   Yes.

6        **PRESIDING COMMISSIONER SHELTON:**   Did you not

7    know your father.

8        **INMATE REED:**   I never met him.   I didn't know I

9    had another father until I was about 13, 13 or 14.

10       **DEPUTY COMMISSIONER STAR:**   You have four

11   brothers and sisters?   Four sisters?

12       **INMATE REED:**   Four sisters.

13       **PRESIDING COMMISSIONER SHELTON:**   Do you keep in

14   contact with any of them?

15       **INMATE REED:**   Yeah, we try to stay in contact.

16       **PRESIDING COMMISSIONER SHELTON:**   Whereabouts do

17   they live?   Were any of them in California?

18       **INMATE REED:**   Yes, all of them are in

19   California except for one.   Anita, she's in Texas.

20       **PRESIDING COMMISSIONER SHELTON:**   Anybody else

21   besides your brother been in trouble?

22       **INMATE REED:**   Yeah.   I have a sister, Lawanda,

23   who was in trouble at one time.

24       **PRESIDING COMMISSIONER SHELTON:**   Do you

25   remember what for?

26       **INMATE REED:**   No, I don't.   She did a couple

27   years in prison.   She's been out since.   I think that

1   was like in 1989, I think, '88, '89, somewhere around

2   there.  My brother Jay, Jervance, he was in and out of

3   jail all the time.  He stayed in trouble.  He got out

4   in 95, and went into the trade and became, got a job

5   repairing computers.

6   **PRESIDING COMMISSIONER SHELTON:**  Okay.

7   **INMATE REED:**  And so from my understanding,

8   he's been doing pretty good ever since then.

9   **PRESIDING COMMISSIONER SHELTON:**  You came to

10  California when you were about five?

11  **INMATE REED:**  No.  That was a mistake.  I came

12  to California at around 10, around 10.

13  **PRESIDING COMMISSIONER SHELTON:**  When you came

14  to California, was it your mom and all of the kids?

15  **INMATE REED:**  No.  I came with my grandmother.

16  My grandmother brought me out here, me and my brother

17  Greg who was on this case with me.  We came out here.

18  We lived with my grandmother for a couple years before

19  my mom came, my mother and father and the rest of my

20  brothers and sisters.

21  **PRESIDING COMMISSIONER SHELTON:**  So growing up,

22  how would you describe your life, say 10, the time you

23  came to California at the age of 10, you went to high

24  school?

25  **INMATE REED:**  Uh-huh.

26  **PRESIDING COMMISSIONER SHELTON:**  Graduated from

27  high school, Emeryville High School in '78.

21

1          **INMATE REED:**  Yes.

2          **PRESIDING COMMISSIONER SHELTON:**  How was school

3    for you?

4          **INMATE REED:**  School was -- was hard.  I was

5    considered a slow student.  I had to attend special ed

6    class to try and keep up, and I worked and work my way

7    out of that because I was an athlete, and I was blessed

8    with -- to be a gifted athlete at the time, and so it

9    was really embarrassing to be in special ed class, so I

10   worked my way out of that, but I still couldn't keep up

11   with the regular class, and as a result I struggled,

12   and in order to graduate, I had to attend night school,

13   because my mother would be pretty upset if I hadn't

14   graduated, so I went to night school without her

15   knowing about it so I could get enough credits to

16   graduate.

17         **PRESIDING COMMISSIONER SHELTON:**  So you grew

18   up, large family, went to school, played football in

19   high school, I assume.

20         **INMATE REED:**  High school.

21         **PRESIDING COMMISSIONER SHELTON:**  And then you

22   went on to Laney College?

23         **INMATE REED:**  Right.

24         **PRESIDING COMMISSIONER SHELTON:**  Played

25   football there.

26         **INMATE REED:**  Right.  I went to Laney to play

27   football.  I only stayed one semester, again, because I

1  could not keep up academically, and my pride didn't

2  allow me to ask for help. Help was there available for

3  me with tutors, but I didn't ask for the help. And, as

4  a result of that, I ended up quitting. I left college.

5      **PRESIDING COMMISSIONER SHELTON:** And then what

6  did you do?

7      **INMATE REED:** I got a number of jobs and little

8  jobs here and there, security jobs, cooking jobs,

9  things of that nature. I went -- which I messed up

10  each one of them because of my addiction, and I

11  couldn't -- you know, I'd end up drinking at night and

12  getting high and couldn't get to work on time in the

13  mornings, and as a result I ended up losing each one of

14  those jobs. I went and signed up for the army, marines

15  to be exact, but I couldn't pass the test very good,

16  the math portion of the test, and on three different

17  occasions, you can only take it so many times, and then

18  you can't take it anymore. I used up all of those

19  times. I went three different times to try and enlist

20  in the service because I knew it would --

21      **PRESIDING COMMISSIONER SHELTON:** And what did

22  you do after you couldn't get into the service?

23      **INMATE REED:** Continuing to work the jobs that

24  I would get from time to time, minimum wage jobs, and

25  continued getting drunk.

26      **PRESIDING COMMISSIONER SHELTON:** Until this

27  commitment offense.

23

1           **INMATE REED:**  Until this commitment offense.

2           **PRESIDING COMMISSIONER SHELTON:**  Did you ever

3    get married, sir?

4           **INMATE REED:**  Yes, I did, while I was here in

5    prison.  And --

6           **PRESIDING COMMISSIONER SHELTON:**  When was that?

7           **INMATE REED:**  1988.

8           **PRESIDING COMMISSIONER SHELTON:**  Are you still

9    married?

10          **INMATE REED:**  No, I'm not.

11          **PRESIDING COMMISSIONER SHELTON:**  How long did

12   that last?

13          **INMATE REED:**  Until -- we were married about 15

14   years.

15          **PRESIDING COMMISSIONER SHELTON:**  So it's about

16   2003?

17          **INMATE REED:**  2002.

18          **PRESIDING COMMISSIONER SHELTON:**  Okay.  Any

19   children?

20          **INMATE REED:**  No.

21          **PRESIDING COMMISSIONER SHELTON:**  Okay.  We've

22   talked about your growing up time, your substance abuse

23   issues, high school diploma, athletics, employment.

24   Does anybody come visit you here?

25          **INMATE REED:**  Yes.

26          **PRESIDING COMMISSIONER SHELTON:**  Who?

27          **INMATE REED:**  My aunt, my mom, and my fiancée.

24

1       **PRESIDING COMMISSIONER SHELTON:** Tell me about
2   your fiancée.

3       **INMATE REED:** Shirley, I met her here. She
4   was -- I was in the joint venture programs for a few
5   years, and she was my supervisor. We got in trouble
6   for over familiarity, and she had to leave. We
7   maintained contact, and built the relationship, and our
8   plans are, if and when I ever get released to be
9   married.

10      **PRESIDING COMMISSIONER SHELTON:** How long have
11  you known Shirley?

12      **INMATE REED:** Since 2000.

13      **PRESIDING COMMISSIONER SHELTON:** What does she
14  do for a living right now?

15      **INMATE REED:** She still works for the same
16  company. She wasn't an employee of CDC. She works for
17  a private company, Lab Com, which is a company that
18  deals with the joint venture program, and they make
19  scientific -- they package scientific material used to
20  draw DNA and that type of thing and tips on urine
21  bottles and that kind of things.

22      **PRESIDING COMMISSIONER SHELTON:** Is there
23  anything with regards to your social history or your
24  personal factors that you would like added at this time
25  that we haven't discussed?

26      **INMATE REED:** My social history then?

27      **PRESIDING COMMISSIONER SHELTON:** Yes, prior to

25

1    incarceration.

2        **INMATE REED:** My social history prior to

3    incarceration was horrible. I didn't allow for

4    anything positive to exist in my life because I had

5    given up. I didn't think that I could compete in

6    society. I didn't think -- I believed that I was a

7    slow student. I believed that I couldn't learn right

8    and as a result I couldn't keep up with everything

9    else. I didn't believe I could get a decent job.

10   Heck, I didn't even know how to write out a resume.

11   Because of that, I just continued to be deeper and

12   deeper into my addiction, and all the influences in my

13   life became negative influences, and so as a result, my

14   social history suffered, suffered drastically.

15   Anything positive that came into my life, I like turned

16   the lights out. I just took on a group of friends and

17   all of those friends were into criminal activity and

18   all of my peers were all into criminal stuff, and so I

19   dove into that, and I mean, I didn't grow up that way.

20   My family was, in fact, my mother and my father was

21   ministers, and so I wasn't raised that way, which made

22   it worse because I felt like I needed to prove to the

23   people that I was hanging out with that I was just like

24   them, so I did everything and anything to fit in.

25       **DEPUTY COMMISSIONER STAR:** Can we change the

26   tapes now. Are you fine with that?

27       **PRESIDING COMMISSIONER SHELTON:** One second,

26

1    sir.

2           **DEPUTY COMMISSIONER STAR:** Okay.  Tape 1, Side

3    B for the lifer hearing for Jesse Reed, and we're back

4    on record.

5           **PRESIDING COMMISSIONER SHELTON:** Thank you,

6    sir.  Commissioner, why don't we go to post-conviction

7    factors at this time.

8           **DEPUTY COMMISSIONER STAR:** Okay.  Good morning,

9    Mr. Reed.

10          **INMATE REED:** Good morning.

11          **DEPUTY COMMISSIONER STAR:** Your last hearing

12   was an January 11th, 2006.  It was a one-year denial,

13   and the Board recommended that you remain disciplinary

14   free and continue to participate in self-help groups,

15   so today I'll be reviewing and focusing primarily on

16   what you've done since the last hearing with some

17   summary with what your other program participation

18   activities are.  I primarily relied on Correctional

19   Counselor 1 Tavoya, T-A-V-O-Y-A, January 2007 report

20   that he prepared for the Board.  Your classification

21   score is currently 19 with a Medium-A custody level.

22   Since your last hearing, you've had no disciplinaries.

23   In fact, since your life term started, you have had

24   zero disciplinaries, and you are certainly be to

25   commended for an outstanding record.  In terms of 128

26   counseling chronos, you've had a total of nine.

27          **INMATE REED:** Uh-huh.

27

1    **DEPUTY COMMISSIONER STAR:** But the last one was

2    back in 1988, so that's about 18, 19 years now without

3    any correctional counseling chronos, correct?

4            **INMATE REED:** Correct.

5            **DEPUTY COMMISSIONER STAR:** When I looked at

6    them, they were mostly tardiness, out of bounds issues.

7    Now, I did see this reference to Ad. Seg. housing in

8    2003, and I believe you mentioned to Commissioner that

9    you had a over familiarization with your supervisor.

10   Did you get a disciplinary or any write-up for that,

11   sir?

12           **INMATE REED:** No, I didn't. I didn't.

13           **DEPUTY COMMISSIONER STAR:** Now know why or did

14   they just find you not a party to it or --

15           **INMATE REED:** No, I don't. I don't know why.

16   All I heard during the ICC hearing was that it was a

17   gray area.

18           **DEPUTY COMMISSIONER STAR:** Okay.

19           **INMATE REED:** And that's all.

20           **DEPUTY COMMISSIONER STAR:** So you're --

21           **INMATE REED:** I don't really know what that

22   gray area was. However, thinking about it, I assumed

23   that it was because she was no longer working or she

24   had been suspended when they found out, when this all

25   came to light.

26           **DEPUTY COMMISSIONER STAR:** Okay.

27           **INMATE REED:** She had been suspended from

28

1    working here and on another issue that was unrelated to

2    us, and so assume that that was probably why.

3         **DEPUTY COMMISSIONER STAR:**  During this

4    relationship, were you aware that you may have been

5    crossing the line at the time?

6         **INMATE REED:**  Yes, I was.  I was aware that

7    what we were doing was wrong, and she gave me her phone

8    number.  I gave her a call, and I know that that was

9    wrong that I could get in trouble for that.  I

10   continued anyway because I liked it.  I like that the

11   way she treated me, and I -- not having people to say

12   nice things to you or treat you with respect tends to

13   make you crave that kind of thing, and we were talking

14   and we became good friends.  We would spend the whole

15   day working together and talking was just comfortable

16   talking to one another, and we built a very strong

17   friendship.

18        **DEPUTY COMMISSIONER STAR:**  How many years did

19   this -- when did it start and when did she eventually

20   leave?

21        **INMATE REED:**  It started in 2001.

22        **DEPUTY COMMISSIONER STAR:**  Uh-huh.

23        **INMATE REED:**  Around 2001 or so, I mean, just

24   talking and being friends.

25        **DEPUTY COMMISSIONER STAR:**  When the institution

26   conducted an investigation, did you cooperate with that

27   and tell them that had you been calling her?

29

1        **INMATE REED:**  Yes, I did.  They were recording
2   the telephone calls, and when investigations came and
3   they took me to the office and they played the tapes,
4   and I did cooperate and said that it was me.

5        **DEPUTY COMMISSIONER STAR:**  Had you spoken to
6   her about hiding this or were you trying to hide the
7   relationship?

8        **INMATE REED:**  Yes, we did.  She knew that it
9   was over familiarity to give me her phone number.  And
10  when I called, I would use a fictitious name to try to
11  cover it up.

12       **DEPUTY COMMISSIONER STAR:**  Okay.  Okay.  Let's
13  move on.  Okay.  I looked at your educational and
14  vocational accomplishments.  I think the Commissioner
15  addressed your pre-prison high school graduation.  Some
16  college at Laney, and since you've been incarcerated on
17  your life term, you've obtained your AA degree here at
18  San Quentin through San Quentin's Patten College?  Is
19  that what it's called Patten College program?

20       **INMATE REED:**  Yes, Patten University.

21       **DEPUTY COMMISSIONER STAR:**  And you got that in
22  1998?

23       **INMATE REED:**  My AA degree in 2002.

24       **DEPUTY COMMISSIONER STAR:**  2002 was the final?

25       **INMATE REED:**  Yes.

26       **DEPUTY COMMISSIONER STAR:**  Okay.  Thank you.
27  Was it a liberal arts degree?

30

1          **INMATE REED:** Yes.

2          **DEPUTY COMMISSIONER STAR:** Again,

3     congratulations and you should be commended on that,

4     too, Mr. Reed. Vocationally, the record reflects you

5     have a certificate in the file for vocational

6     electronic data processing.

7          **INMATE REED:** Yes.

8          **DEPUTY COMMISSIONER STAR:** And what was the

9     length or hours of that course? Can you describe it to

10    me?

11         **INMATE REED:** The course is four years. It was

12    a four-year course. So we had six labs we had to

13    complete before completion, six labs and three panels.

14    The final Panel was not unlike what we have here with

15    three people with one guy from the program, TAC,

16    technical advisory committee, a gentleman who owns a

17    computer firm on the outside. He would come in with

18    our instructor, our two instructors, and they would

19    hold the final Panel which was basically a test to see,

20    you know, what you had learned.

21         **DEPUTY COMMISSIONER STAR:** What year did you

22    complete that in?

23         **INMATE REED:** That was completed in '89.

24         **DEPUTY COMMISSIONER STAR:** Okay. Were you here

25    at San Quentin?

26         **INMATE REED:** Yes.

27         **DEPUTY COMMISSIONER STAR:** Thank you. Okay.

31

1    You're currently working as an R and R clerk; is that

2    right?

3              **INMATE REED:**  Right.

4              **DEPUTY COMMISSIONER STAR:**  Looking through your

5    file, this is not uncommon, and certainly not your

6    fault, I did not see any recent supervisory work

7    performance reports.  You haven't received any lately?

8              **INMATE REED:**  No.  I don't know why they

9    stopped.  I have not received any since, I think '98.

10             **DEPUTY COMMISSIONER STAR:**  Well, actually, I

11   saw one as a clerical from 2003 in your file, but it

12   was not your R and R assignment.  How long have you

13   been in the R and R assignment?

14             **INMATE REED:**  For a year now.

15             **DEPUTY COMMISSIONER STAR:**  One year?

16             **INMATE REED:**  Yeah.

17             **DEPUTY COMMISSIONER STAR:**  And let's talk about

18   your self-help group participation.  I'm going to refer

19   to the counselor's report, and the counselor does a

20   rather thorough, summary, sir, of your totality of

21   self-help group participation, and just to summarize, I

22   saw participation in the squires program.

23             **INMATE REED:**  Yes.

24             **DEPUTY COMMISSIONER STAR:**  Cairos?

25             **INMATE REED:**  Right.

26             **DEPUTY COMMISSIONER STAR:**  Victim's offender

27   reconciliation group.

32

1        **INMATE REED:**  Uh-huh.

2        **DEPUTY COMMISSIONER STAR:**  Categrew (phonetic)

3    program, fatherhood workshop, Overcomer's Outreach

4    which is a 12-step group.

5        **INMATE REED:**  Uh-huh.

6        **DEPUTY COMMISSIONER STAR:**  A three-year course

7    on self confrontation.

8        **INMATE REED:**  Right.

9        **DEPUTY COMMISSIONER STAR:**  Participation in

10    Alternatives to Violence, participation in the arts and

11    corrections, a self-esteem enhancement group, a music

12    achievement certificate, participation in a ceremony

13    remembering the 9/11 victims, and then after that

14    several chronos documenting participation in NA, AA,

15    and, of course, the IMPACT Program.  Now, since your

16    last hearing, you've participated in IMPACT.

17        **INMATE REED:**  Uh-huh.

18        **DEPUTY COMMISSIONER STAR:**  And NA, and your

19    counselor has provided me updated chronos that also

20    verify that, chronos as recent as September 30th of '06

21    verifying your participation in Tuesday's NA program.

22        **INMATE REED:**  Uh-huh.

23        **DEPUTY COMMISSIONER STAR:**  For the third

24    quarter and another chrono for June 30th before that

25    and then several chronos documenting your participation

26    throughout 2006 in IMPACT Program, I-M-P-A-C-T, one

27    dated March 27th, another dated April 17th, another

33

1    dated May 22nd, and the last one dated June 19th, '06,

2    and I'm sorry I failed to mention a February 6th, 2006

3    IMPACT chrono too.  So you've continued to participate

4    in that since your last hearing as well as NA, correct.

5           **INMATE REED:**  Yes.

6           **DEPUTY COMMISSIONER STAR:**  As well as several

7    other self-help groups in the years since your life

8    term.  I saw a certificate in your file, a certificate

9    of appreciate this year, too, for, I believe it was for

10   service in the Protestant ministry, so you participate

11   in that church program there?

12          **INMATE REED:**  Yes, I do.  In fact, I just

13   signed up for seminary school.

14          **DEPUTY COMMISSIONER STAR:**  Okay.  Do you have a

15   goal there?

16          **INMATE REED:**  Yes, I do.

17          **DEPUTY COMMISSIONER STAR:**  What is that, sir?

18          **INMATE REED:**  I would like to be a chaplain one

19   day.

20          **DEPUTY COMMISSIONER STAR:**  Okay.  You said your

21   parents were ministers?

22          **INMATE REED:**  Yes

23          **DEPUTY COMMISSIONER STAR:**  Protestant as well?

24          **INMATE REED:**  Yes.

25          **DEPUTY COMMISSIONER STAR:**  Okay.

26          **INMATE REED:**  Yes.

27          **DEPUTY COMMISSIONER STAR:**  And what's necessary

1    to accomplish that goal in the program here?

2         **INMATE REED:**  Through Patten College, we had,

3    because that's a -- that is a theology school as well,

4    we had to take a number of courses that were religious

5    based, and in order to receive your AA.  I would like

6    to finish that off and transfer those credits to Golden

7    Gate Seminary.  The new pastor that we have here at San

8    Quentin, he's been in the program, and he gave us these

9    applications to fill out a couple weeks ago to be

10   enrolled in the Golden Gate Seminary.

11        **DEPUTY COMMISSIONER STAR:**  How many courses do

12   you have to take to complete that?

13        **INMATE REED:**  It will be a number of courses.

14   I believe 48.  It will be a BA program.

15        **DEPUTY COMMISSIONER STAR:**  Okay.

16        **INMATE REED:**  It will be a bachelor's degree

17   program.

18        **DEPUTY COMMISSIONER STAR:**  Now, you have a long

19   history of participating in AA and NA.  Which one of

20   the steps advises you to make amends to victims?

21        **INMATE REED:**  Step -- that advises me to make

22   amends to the victim would be step number 9.  8 or 9.

23        **DEPUTY COMMISSIONER STAR:**  And I see some

24   letters from the family of the victim in your file.

25        **INMATE REED:**  Yes.  Yes.

26        **DEPUTY COMMISSIONER STAR:**  What did you do?

27   And when did you do that?

35

1      **INMATE REED:**  I was involved in Solano in the
2   VOR program, the victim's reconciliation group, and we
3   had a speaker come in one time and he talked about
4   getting in touch with our victims, and, and apologizing
5   for the wrong that we had done, the harm that we've
6   caused, the pain that we've caused their families, and
7   that really spoke to me, and I wrote a letter
8   explaining what I was at that time.

9      **DEPUTY COMMISSIONER STAR:**  To who?

10     **INMATE REED:**  To the Bates family, but my mom
11  frequented a church that one of the family members that
12  would frequent, so I sent the letter to my mother and
13  had her to give that to the -- give it to them, and
14  they found it in their hearts to forgive me.

15     **DEPUTY COMMISSIONER STAR:**  Did they write back
16  directly to you or did they convey this via your
17  mother?

18     **INMATE REED:**  They conveyed it to my mother and
19  then they wrote me a letter, which I didn't expect.  I
20  wasn't expecting anything like that.  And because there
21  was nothing I can -- there's nothing I can do to make
22  up for what I did.  I remember Mr. Bates' mother and
23  grandmother coming to court every day.

24     **DEPUTY COMMISSIONER STAR:**  Since that effort,
25  did you have any other correspondence with the family?

26     **INMATE REED:**  One other time.  My mother stayed
27  in contact with them, and I think she is to this day,

36

1   and they sent me another letter in 2001, I believe.

2       **DEPUTY COMMISSIONER STAR:** Directly to you or

3   to your mother?

4       **INMATE REED:** To my mother, and then my mother

5   sent it to me.

6       **DEPUTY COMMISSIONER STAR:** Okay. Okay. All

7   right. Let's move on, Mr. Reed, to the review of the

8   psych reports. The last one that was done was actually

9   prior to your last Panel review. It was done January

10  28th, 2005, prior to your last hearing. It was done by

11  Dr. Inaba, spelled I-N-A-B-A. Dr. Inaba is a -- hang

12  on a second is a psychiatrist.

13      **ATTORNEY CARBONE:** A contract psychologist.

14      **DEPUTY COMMISSIONER STAR:** Thank you. Contract

15  psychologist. Actually, the report is dated December

16  20th of '05. I've reviewed it, and I'm going to just

17  paraphrase parts of the doctor's reports. First, while

18  in terms of any diagnostic impressions, the doctor

19  states that you, your Axis I diagnosis is polysubstance

20  abuse dependence in full remission, and adult anti-

21  social behavior by your history. Axis II, no

22  diagnosis, Axis III, none noted, and Axis V, your GAF

23  score is 80. The doctor actually spends considerable

24  time and effort in the report, speaking of your remorse

25  for the crime. And I think you've addressed it briefly

26  yourself, today, Mr. Reed. He says that you were

27  distressed and horrified that you were the person who

1    committed this crime.  He also indicates your, you feel
2    responsible for the fact that your brother, and I'm
3    sorry, and I missed, is that brother younger or older,
4    sir?

5           **INMATE REED:**  Yes, he's younger.

6           **DEPUTY COMMISSIONER STAR:**  Younger brother has
7    also spent years in prison behind this crime.  And
8    you've expressed sorrow for the fact that your mother
9    has had two sons in prison for this period of time.
10   The doctor found you quite sincere that you found a
11   different purpose in life, and reading from Page 4 of
12   the doctor's report, he says Mr. Reed's history has few
13   factors associated with recidivism for violent
14   behavior.  He was on probation at the time of his
15   offense and has a history of substance abuse.  Other
16   than that, he does not have a history of major mental
17   illness, psychopathy, relationship instability,
18   previous violence or early maladaption.  He also does
19   not have negative attitudes, impulsivity or lack of
20   insight.  Mr. Reed also has a feasible plan for parole
21   and a personal support network.  Based on review of
22   these factors and clinical assessment, it would seem
23   that Mr. Reed no longer poses an unreasonable risk to
24   the community.  And he further says that other than
25   participating in AA and NA, he did not think you would
26   need any other assistance should you be released.  I
27   scanned the report prior to this just to see if there

38

1    was anything else noteable, looking at a March 22nd,

2    2001 report by contract psychologist Jeko, Jeko or

3    Gecko, I'm not sure how it's pronounced, J-E-K-O.  And

4    at that time in 2001, Dr. Jeko said you appeared

5    suitable for parole based on psychological conditions

6    but also expressed the same concern for the condition

7    of parole addressing drugs and alcohol as one concern.

8    And Jeko also said, Dr. Jeko also said:  "Mr. Reed

9    appears to have matured and developed the internal

10   controls necessary not to be a threat to the community

11   as long as he remains drug and alcohol free and also

12   saw no psychiatric designation," and he felt your

13   community living plans appeared good at that time.

14   Okay.  Anything you want to -- I've kind of done a

15   quick summary, sir, of your, everything you've done

16   since the last hearing, and your programming, anything

17   I've missed?  That you want to add or comment on?

18        **INMATE REED:**  No.  You didn't mention anything,

19   I believe.

20        **DEPUTY COMMISSIONER STAR:**  Well, you're going

21   to be given another opportunity.  If there's something,

22   just feel free to bring it up.  Turn your attention

23   back to the Commissioner for parole plan review.

24        **PRESIDING COMMISSIONER SHELTON:**  Let's talk

25   about your parole plans, sir.

26        **INMATE REED:**  Okay.

27        **PRESIDING COMMISSIONER SHELTON:**  The Board

1   report indicates that you have a couple different

2   places or options, I should say, for living.

3         **INMATE REED:**  Right.

4         **PRESIDING COMMISSIONER SHELTON:**  One would be

5   with your mom in Emeryville.

6         **INMATE REED:**  Uh-huh.

7         **PRESIDING COMMISSIONER SHELTON:**  One would be

8   with your Aunt Theresa McCrady in Oakland.

9         **INMATE REED:**  Yeah.

10        **PRESIDING COMMISSIONER SHELTON:**  And one would

11  be with your fiancée, Shirley Hall, in Marin City?

12        **INMATE REED:**  Right.

13        **PRESIDING COMMISSIONER SHELTON:**  Who would be

14  your first choice?

15        **INMATE REED:**  Well, my preference would be with

16  Shirley in Marin City.

17        **PRESIDING COMMISSIONER SHELTON:**  That's a good

18  answer starting with she's your fiancée.  I'm teasing

19  you.  Mom, fiancée.

20        **DEPUTY COMMISSIONER STAR:**  Or she may be ex-

21  fiancée.

22        **ATTORNEY CARBONE:**  That's kind of what I --

23        **PRESIDING COMMISSIONER SHELTON:**  So anyway, so

24  Shirley lives in Marin City.

25        **INMATE REED:**  Yes.

26        **PRESIDING COMMISSIONER SHELTON:**  Okay.  So you

27  have three different options.  Are these all in Alameda

40

1    County?

2            **INMATE REED:**  Two is Alameda County and Marin

3    City is in Marin.

4            **PRESIDING COMMISSIONER SHELTON:**  Okay.  And

5    talk to me about employment.  It says here you received

6    a job offer from Branch Internet.

7            **INMATE REED:**  Branch.

8            **PRESIDING COMMISSIONER SHELTON:**  And I know it

9    says the letter was dated over a year ago in here, so

10   we'll look through these in just a second, but is that

11   still your standing job offer?

12           **INMATE REED:**  Yes.  Yes.  I have a couple of

13   other job offers as well.

14           **PRESIDING COMMISSIONER SHELTON:**  Tell me about

15   all of them.  Which one would be your preference number

16   one?

17           **INMATE REED:**  Branch would be my preference.

18   And then as well, along with the singing opportunity

19   that I have.

20           **PRESIDING COMMISSIONER SHELTON:**  I saw that,

21   and we haven't talk about that so that's a good segue

22   into, because I made a note to ask you a question but

23   you evidently do gospel singing?

24           **INMATE REED:**  Yes, I do.  I grew up singing in

25   the church, and it's one of my life's joys.  Over the

26   years, I became better at it, and I received, through

27   the Protestant chapel here, a number of opportunities

41

1    to do some recording upon my release.

2         **PRESIDING COMMISSIONER SHELTON:** Since we're

3    talking about it, I do have a letter from Firstborn

4    Production gospel recording production company, and

5    this is signed by the president named Mr. Brag. It

6    said a friend heard you singing while attended services

7    in the San Quentin Garden Chapel and told him about

8    you, and he would like to schedule an audition for you

9    upon your release. Very nice.

10        **INMATE REED:** Thank you.

11        **PRESIDING COMMISSIONER SHELTON:** Okay. Let's

12   go through some of your letters and I may or may not

13   have duplicates. I may have some here in the file.

14        **ATTORNEY CARBONE:** Commissioner, this may be an

15   opportune time to mention his second job offer.

16        **PRESIDING COMMISSIONER SHELTON:** Yeah, I was

17   just going to -- I was going to -- wait. I went

18   through the branch internet. Let's back up to Branch

19   Internet. What exactly would you be doing there?

20        **INMATE REED:** What I would be doing there is

21   keeping track of all the stock materials, calling and

22   contacting vendors, keeping -- basically keeping stock

23   of everything that comes in.

24        **PRESIDING COMMISSIONER SHELTON:** For the

25   shopping service? It's an internet stopping service?

26        **INMATE REED:** It's an internet shopping.

27   They're also planning on opening a floor, evidently, in

1   San Francisco.

2           **PRESIDING COMMISSIONER SHELTON:**  How do you

3   know the owner, Tracy Brient?

4           **INMATE REED:**  Brient, Tracy Brient.

5           **PRESIDING COMMISSIONER SHELTON:**  Brient

6           **INMATE REED:**  She was one of my instructors in

7   the college program, my computer instructor at the

8   business class that I take.  When she left the program,

9   she had told us, the class that we had pretty the same

10  guys, and let us know that we, if there's anything in

11  the future that she could do for us, she would more

12  than be willing to help us out and I've stayed in

13  contact with her, and she offered me a job offer in

14  2001, and has remained consistent in that.

15          **PRESIDING COMMISSIONER SHELTON:**  Okay.

16          **INMATE REED:**  I'd like to think I was a pretty

17  good student.

18          **PRESIDING COMMISSIONER SHELTON:**  You know, I

19  wanted to address that, and I will.  I want to go into

20  your job number two outside the singing possibility.

21  What's your other job offer?

22          **INMATE REED:**  The other job offer is a roofing

23  job with Charles Cooper in Emeryville.  He was a

24  company, and he's offered me a job in construction wok.

25          **PRESIDING COMMISSIONER SHELTON:**  And how do you

26  know him?

27          **INMATE REED:**  He's a friend of my mom's, and I,

43

1    in the past, I've done some construction work. My

2    father was a ceiling mason and finisher, and I used to

3    do a lot of work with him finishing ceiling. And he

4    worked for Kahill Construction, and when he had little

5    odd jobs from time to time, he would send me. He

6    taught me as a teenager. I did a little carpentry work

7    as well, which is one of the things that I really did

8    like doing, working with my hands. After I came to

9    prison --

10        **PRESIDING COMMISSIONER SHELTON:** What is your

11   first choice?

12        **INMATE REED:** My first choice is Branch with

13   Branch. That goes along with my trade.

14        **PRESIDING COMMISSIONER SHELTON:** It does.

15   Let's review some of your letters. We'll review all of

16   them. These are in no particular, and I may run across

17   some duplicates because I have some in your file and I

18   have some that you handed me, so we have a letter dated

19   November 2006 from Samuel Huddleston, and he is a

20   minister.

21        **INMATE REED:** Yes.

22        **PRESIDING COMMISSIONER SHELTON:** And he writes

23   a support letter. I'm not going to read them. I'm

24   just going to summarize them. We have a support letter

25   from Theresa McCrady, who is your aunt. She's one that

26   you had put down as a possible residence, is she not?

27        **INMATE REED:** Uh-huh.

44

1       **PRESIDING COMMISSIONER SHELTON:**  Okay.  Then we
2   have a letter from Mr. Stubblefield and I think we have
3   one here as well, so we'll set that one up too.  Mr.
4   Stubblefield writes a support letter.  He talks about
5   your work in the ministry, your singing, and you are
6   the director of the San Quentin choir.

7       **INMATE REED:**  Yes.

8       **PRESIDING COMMISSIONER SHELTON:**  Very good.
9   Yes, and Mr. Stubblefield participates in the Baptist
10  church, Tiburon Baptist church, so that's how he knows
11  you.  He comes in.

12      **INMATE REED:**  Yes.  He also teaches classes
13  too, in the Patten College program as well.

14      **PRESIDING COMMISSIONER SHELTON:**  Okay.

15      **INMATE REED:**  And I understand he will be
16  teaching another Golden Gate Seminary as well.

17      **PRESIDING COMMISSIONER SHELTON:**  That's the
18  program you want to go into?

19      **INMATE REED:**  Right.

20      **PRESIDING COMMISSIONER SHELTON:**  You have a
21  letter dated November 1st, 2006 from Elder Darnell
22  Clayton, Junior, Pastor, and that's a support letter as
23  well from the new life worship center.  We have a
24  different letter from Mr. Stubblefield.  And we have a
25  letter from Brenda Lowe, and she's actually, the wife's
26  name is Brenda Lowe.  This is from William Lowe.

27      **INMATE REED:**  Brenda and William.

45

1          **PRESIDING COMMISSIONER SHELTON:**  Right.

2          **INMATE REED:**  She's a professional gospel

3     singer.

4          **PRESIDING COMMISSIONER SHELTON:**  Okay.  They've

5     been participating in volunteers in the prison.  They

6     write a very nice support letter for you.  Okay.  Let

7     me go over here.  Then we have a Reverend Johnny Stein,

8     dated November 28th, 2006.  He's the associate minister

9     in charge of the prison program at San Francisco

10    Christian church, and he writes a letter of support for

11    you.  We have a letter from Miss Lois Parks.  This

12    would be your mother.

13         **INMATE REED:**  Right.

14         **PRESIDING COMMISSIONER SHELTON:**  And she talks

15    about your successes.  She says she's an ordained elder

16    for 31 years.

17         **INMATE REED:**  Yes.

18         **PRESIDING COMMISSIONER SHELTON:**  She has a

19    five-bedroom, two-bath house in Emeryville available

20    for you to live in.

21         **INMATE REED:**  Uh-huh.

22         **PRESIDING COMMISSIONER SHELTON:**  And she

23    participates in the Emeryville Community Action Program

24    which you would be able to participate in too.

25         **DEPUTY COMMISSIONER STAR:**  Okay.  Let's go

26    ahead and change that one.

27         **PRESIDING COMMISSIONER SHELTON:**  Are these very

1   short tapes or something?

2       **DEPUTY COMMISSIONER STAR:** The beeper goes off

3   earlier, but if you don't change it, it will beep,

4   beep, beep while you're talking.

5       **PRESIDING COMMISSIONER SHELTON:** I can tell.

6       **DEPUTY COMMISSIONER STAR:** Okay. Everyone

7   relax, and it will drive you all crazy. Let me --

8       **PRESIDING COMMISSIONER SHELTON:** Usually I can

9   do a hearing on one tape.

10      **DEPUTY COMMISSIONER STAR:** Okay. This is Tape

11  2, Side A for the hearing for Jesse Reed, and we're

12  back on record.

13      **PRESIDING COMMISSIONER SHELTON:** All right.

14  Thank you. We were just reviewing Mr. Reed's support

15  letters, and we were talking, about, I think, this is a

16  letter from Mr. Clayton, Junior, and this is a

17  duplicate of your aunt's letters, and then we have some

18  employment offers. Let me give those back to you so

19  you can have those in hand as well as this one. And

20  then we have Cooper's Roofing as you indicated,

21  Clarence Cooper is the owner and partner of the roofing

22  company. He said he would start you off at 27.50 per

23  hour. You can buy stocks in the company; you can move

24  up on the pay scale. So he's provided us with all the

25  information we need to contact him, so it looks like

26  he's provided us with everything we need and would like

27  to offer you a well paying position.

1          **INMATE REED:**  I didn't receive that letter.

2          **PRESIDING COMMISSIONER SHELTON:**  You never saw

3     it?  Well, I'm not going to show it to you.

4          **INMATE REED:**  It came in kind of late.

5          **PRESIDING COMMISSIONER SHELTON:**  You need to

6     have that.  You need to make sure you get copies of

7     those in your file because there aren't any of that.

8     We have a letter dated November 6th, 2006, from Tracey

9     Brient, and this would be the branch intro net home

10    network program you told us about.  He does indicate

11    that you were a student.  I keep saying the name wrong.

12    It's Brient, huh?

13         **INMATE REED:**  Uh-huh.

14         **PRESIDING COMMISSIONER SHELTON:**  Computer

15    classes.  She refers to her partner Paul.  They would

16    like to bring you on board.  They will do training as

17    well.  They want you to manage their website

18    operations, which would be right up your alley with the

19    vocation that you have in place.  And she gives the

20    website that can be looked at, verifying your rate of

21    pay would be 12.50 an hour to start plus health and

22    dental insurance.  And, evidently, commuter checks.

23    They would pay for public transportation to get you

24    there and back and sick leave and vacation.  It's a

25    good thing your health is good because she indicates

26    there's lots of heavy lifting involved.  Are these some

27    of the things that are on the line?

48

1          **INMATE REED:** Yes.

2          **PRESIDING COMMISSIONER SHELTON:** Crib candy, it

3    look like air thingies, things that make the air smell

4    good, plants, herbs, book marks, a variety of products

5    across of Board, gets people to spend lots of money on

6    those shopping shows. Fortunately, I'm not one of

7    them. All right, sir, so just to verify, we have three

8    residential places, and two job offers and a potential

9    singing career.

10          **INMATE REED:** That's right.

11          **PRESIDING COMMISSIONER SHELTON:** Potential. Is

12    there anything that you would like to add with regards

13    to your parole plans at this time?

14          **INMATE REED:** Yes, also, self-help. The

15    address, if I parole to Oakland, the recovery center I

16    would be attending the recovery center in East Oakland

17    on McArthur Boulevard.

18          **PRESIDING COMMISSIONER SHELTON:** Is it called

19    the recovery center?

20          **INMATE REED:** Yes, Resolve and Recovery Center.

21          **PRESIDING COMMISSIONER SHELTON:** And what do

22    you hope to accomplish there?

23          **INMATE REED:** To maintain my NA participation.

24          **PRESIDING COMMISSIONER SHELTON:** You don't --

25    you need this is something you're going to need for a

26    while?

27          **INMATE REED:** Yes. I think that there's no

49

1    question I'm an addict.  Some people -- some people can
2    drink socially and go out and do things.  I can't.  I'm
3    not one of those people and talking to other people who
4    have been through the same thing that I've been through
5    helps to keep you, keep you focused and on track.  I
6    would like to one day get into H and H work.

7         **PRESIDING COMMISSIONER SHELTON:**  What is H and
8    H?

9         **INMATE REED:**  When you go out and you talk to
10   people, you tell your story basically, and how you came
11   to recovery and share your hopes and experiences with
12   them in hopes that they can some kind of relate to
13   something about your story can relate to their lives
14   and help them make a change in their life and maintain
15   their sobriety.

16        **PRESIDING COMMISSIONER SHELTON:**  So you plan to
17   continue on?

18        **INMATE REED:**  Yes.

19        **PRESIDING COMMISSIONER SHELTON:**  Through the
20   recovery center?

21        **INMATE REED:**  Yes.

22        **PRESIDING COMMISSIONER SHELTON:**  They offer an
23   NA program there?

24        **INMATE REED:**  Right.  That's the one in East
25   Oakland.  I also have the address to the one in Marin
26   as well, Marin address as well.

27        **PRESIDING COMMISSIONER SHELTON:**  One thing, do

50

1   you have a letter from your fiancée about coming and

2   living with her?

3           **INMATE REED:** Did she --

4           **ATTORNEY CARBONE:** I did not. I did not.

5           **DEPUTY COMMISSIONER STAR:** What's her last

6   name?

7           **INMATE REED:** Hall.

8           **DEPUTY COMMISSIONER STAR:** I didn't see it

9   either.

10          **INMATE REED:** I think she sent one last year.

11          **PRESIDING COMMISSIONER SHELTON:** Well, we've

12  got one from your mom. Okay. Moving forward, and this

13  is the portion of the hearing where we can ask

14  questions and that would be the Commissioner and myself

15  as well as Mr. Lim from the DA's office and your

16  attorney. Now, I have a couple of questions for you,

17  and I know you've been answering them all along. You

18  mentioned, as did Commissioner Star that you

19  participated quite a bit in a program called IMPACT?

20          **INMATE REED:** Yes.

21          **PRESIDING COMMISSIONER SHELTON:** What was the

22  single most important thing you got out of that

23  program? Name one.

24          **INMATE REED:** Only one. Image verses reality.

25  We -- many of us have a tendency to put on these masks,

26  pretending to be someone or something that we're not.

27  The reality is we're someone else. I spent my life

1    thinking that -- that I was someone I wasn't.  I wasn't
2    a drug addict, I wasn't raised to be an alcoholic, and
3    I picked up the habit, and continued to live that out.
4    Each day I woke up to put on this mask of drug addict,
5    of alcoholic and lived that out.  During IMPACT, I
6    realized that that wasn't who I was.  It was who I was
7    under the influence, but it wasn't who I was without
8    the drugs, without the alcohol, without all this stuff
9    that makes -- made me want to fit in with a group of
10   negative people.  Image verses reality is something
11   that really stuck out to me, the image of who I am
12   today and not the mask that I wore for so many years.
13        **PRESIDING COMMISSIONER SHELTON:**  Okay.  When is
14   the last time you used drugs or alcohol?
15        **INMATE REED:**  The night I was arrested.
16        **PRESIDING COMMISSIONER SHELTON:**  So you have
17   not used inside the institution?
18        **INMATE REED:**  No, no, no.  I have no desire to
19   ever go down that road again.  My use of alcohol and
20   drugs destroyed so many people.  It destroyed -- in my
21   use of alcohol and drugs, I destroyed the Bates family,
22   and the choices that I made in my addiction; I took
23   away any chance for his children to have a father, to
24   be guided, any questions, or spend time with their
25   father.  I hurt his mother, his grandmother who loved
26   him, his sisters.  I hurt my own family because my mom
27   and my father didn't raise me to be the person that I

52

1   was.  I hurt my brother and his son because his son had
2   to grow up without his father being with him, and my
3   brother had to grow up without being able to mentor his
4   son.  His son came to prison and this past year.
5   Basically, I believe, looking for his father, and I
6   thank God that I had the opportunity, I was here, and I
7   had the opportunity to talk to him, and I let him know
8   that he doesn't have to go down this path, that he
9   could do better with his life and he got out and he got
10  a decent job, and he's getting married.  And I'm hoping
11  that -- that he will maintain that.  I hurt so many, so
12  I will never, ever, ever, have plans on going back.

13          **PRESIDING COMMISSIONER SHELTON:**  I have one
14  other question for you.  You went through school and
15  high school in special ed classes.  How did you manage
16  to achieve an AA here?

17          **INMATE REED:**  That's something I meant to
18  address earlier.  The problem in school was that I
19  didn't apply myself.  I was, instead of going home to
20  study, I'd be out playing and doing something else
21  other than studying.  What I learned when I was in EDP,
22  electronic data processing, is that I had to study.  If
23  I wanted to get that trade, if I wanted to complete it
24  and be a good programmer, because we competed with one
25  another to see who was -- who was better, who wrote the
26  best programs.  If I wanted to keep up, I had to study.
27  I spent a lot of nights studying.  I realized when I

1    competed; I realized that I could learn.  That I wasn't

2    slow.  I might have to apply myself a little more than

3    the next person, but I could learn.  And when I signed

4    up for the Patten program, I did just that.  I studied,

5    studied hard.  I may have read something three or four

6    times, but I can grasp it, and I can take a test and

7    pass it, but I realize that I have to apply myself.

8         **PRESIDING COMMISSIONER SHELTON:**  I have no

9    other questions at this moment.  Commissioner?

10        **DEPUTY COMMISSIONER STAR:**  Just a quick one.

11   You mentioned the East Oakland recovery program.  Do

12   you have any letters today that you will, you know

13   that --

14        **INMATE REED:**  No.  I don't have any letters.  I

15   just have the address.  I just got the addresses and

16   the phone numbers.

17        **DEPUTY COMMISSIONER STAR:**  Okay.

18        **INMATE REED:**  And the times, the nights, the

19   times that they offer the programs.

20        **DEPUTY COMMISSIONER STAR:**  Okay.

21        **INMATE REED:**  Mondays and Fridays, Mondays at

22   5:30 p.m., Friday's at 6:00 p.m.

23        **DEPUTY COMMISSIONER STAR:**  Okay.  Thank you.

24        **PRESIDING COMMISSIONER SHELTON:**  That's like a

25   drop-in center then?

26        **INMATE REED:**  Right.  Right.  We just drop in.

27        **PRESIDING COMMISSIONER SHELTON:**  It's not

54

1    residential?

2         **INMATE REED:** No.

3         **PRESIDING COMMISSIONER SHELTON:** You just go --

4         **INMATE REED:** You just go.

5         **PRESIDING COMMISSIONER SHELTON:** -- and attend

6    the NA meetings.

7         **INMATE REED:** Right. It's open to anyone.

8         **DEPUTY COMMISSIONER STAR:** Okay. No other

9    questions.

10        **PRESIDING COMMISSIONER SHELTON:** Thank you.

11   Mr. Lim, do you have any questions?

12        **DEPUTY DISTRICT ATTORNEY LIM:** Yes, I do.

13   Thank you very much.

14        **PRESIDING COMMISSIONER SHELTON:** Just to remind

15   you and you, questions have to be addressed to the

16   Board and your answers addressed to the Board.  Thank

17   you.  As awkward as that is.

18        **DEPUTY DISTRICT ATTORNEY LIM:** No.  I

19   understand.  Thank you for reminding me.  I was hoping

20   that the Board could ask Mr. Reed, according to the

21   probation report generated by the prosecuting attorney

22   back at the time of the commitment offense trial that

23   the inmate was on probation for a DUI when he committed

24   this offense.  I was wondering because the probation

25   report is silent, whether or not one of the terms of

26   his probation for the misdemeanor DUI was attending

27   substance abuse counseling as part of that probation?

55

1          **PRESIDING COMMISSIONER SHELTON:**  Do you

2    understand the question?

3          **INMATE REED:**  Yes.  Was it?

4          **PRESIDING COMMISSIONER SHELTON:**  Were you on

5    the probation at the time?  Let's start there.

6          **INMATE REED:**  Yes, I was.

7          **PRESIDING COMMISSIONER SHELTON:**  Was it for

8    DUI?

9          **INMATE REED:**  I believe so, yeah.

10         **PRESIDING COMMISSIONER SHELTON:**  And what were

11   your conditions of probation?  Were you to be

12   participating in some type of substance abuse class?

13         **INMATE REED:**  I don't know.

14         **PRESIDING COMMISSIONER SHELTON:**  Were you given

15   any kind of probation term that said do not drink?

16         **INMATE REED:**  I don't remember.  I really don't

17   recall at this time.

18         **DEPUTY DISTRICT ATTORNEY LIM:**  I was wondering

19   if the Commissioner could also ask Mr. Reed that I

20   notice in his CINI that in 1980, he applied for a

21   license to carry a firearm as an employee as a security

22   guard and whether or not he actually ever received that

23   license?

24         **INMATE REED:**  No, I didn't.

25         **DEPUTY DISTRICT ATTORNEY LIM:**  Along those same

26   lines, (inaudible) in applying for that license, would

27   the Commissioner consider asking Mr. Reed if he, at any

56

1   time, received training in firearms in anticipation of

2   receiving that license or in his capacity as a security

3   guard?

4        **INMATE REED:**  Yes, I did.

5        **DEPUTY DISTRICT ATTORNEY LIM:**  I was wondering

6   if the Commissioner could ask him, just briefly to

7   outline the nature of the training with firearms.

8        **INMATE REED:**  The nature of the training was a

9   one-day class when we talked about the different types

10  of calibers of guns, the speed of the bullets, that

11  type of thing.  The in-class training was one day, then

12  we went out like the next week to fire our weapons, to

13  qualify, scoring.

14       **DEPUTY DISTRICT ATTORNEY LIM:**  I just have a

15  quick follow-up, could the commission ask Mr. Reed if

16  that course also included instruction in firearm

17  safety?

18       **INMATE REED:**  Yes, it did.  Yes, it did.

19       **DEPUTY DISTRICT ATTORNEY LIM:**  And could the

20  commission consider asking Mr. Reed whether at the time

21  of the commitment offense he owned a firearm in his

22  capacity as a security guard?

23       **INMATE REED:**  No, I didn't.

24       **DEPUTY DISTRICT ATTORNEY LIM:**  I just wanted to

25  verify also in his CINI relating to the 1981 offense.

26  I apologize to the commission and to Mr. Reed but if

27  the commission could just ask Mr. Reed to verify was he

57

1    saying that he tried to sell a loaded firearm to the

2    gentlemen on the AC transit bus in Alameda County?

3              **INMATE REED:**  Yes, I did.

4              **DEPUTY DISTRICT ATTORNEY LIM:**  The part I

5    didn't understand, and I thank Mr. Reed and the

6    commission, whether or not the firearm was loaded.  I

7    also noticed in the CINI and this is just for

8    verification for us that there are two entries on that

9    entry for possession of a loaded firearm.  One, I

10   believe, shows an arrest date on or about April, and

11   then the second I think shows a disposition date of

12   November of 1981, and on the arrest entry, there shows,

13   the third line, an arrest for the violation of Penal

14   Code 44E, which is theft of a credit card.  Mr. Reed's

15   recitation of the event involving the firearm in the

16   bus is silent with regards to the theft of an access

17   card.  I noticed that it wasn't ultimately charged and

18   I was wondering if the commission could ask Mr. Reed if

19   he had any explanation as to how that charge was put on

20   the arrest?

21             **PRESIDING COMMISSIONER SHELTON:**  Do you

22   remember anything about a credit card.

23             **INMATE REED:**  I don't remember anything about a

24   credit card.  I never stole any credit card.  I don't

25   know where that came from.  That's the first I ever

26   heard of it.

27             **DEPUTY DISTRICT ATTORNEY LIM:**  For the record,

58

1    I'm looking at the last page of the CINI record
2    included in Mr. Reed's file.  It's an arrest date for
3    April 16th, 1981, for the record, but I do notice that
4    it was that particular charge was not filed, but I was
5    just -- moving on, I was wondering if the commission
6    would consider asking Mr. Reed, he mentioned in talking
7    about his fiancée, Shirley Hall that he never received
8    a disciplinary because he was told that it was a gray
9    area because Miss Hall had already been suspended for
10   another incident, and I was wondering if the commission
11   would ask Mr. Reed what the other incident was that
12   caused Miss Hall to be suspended.

13       **INMATE REED:**  One of the guys in the program
14   had complained that he wasn't being treated right, that
15   it was a harsh work environment, and he filed a 602
16   inmate appeal on that, and she was suspended,
17   subsequently suspended.  It had been a second time
18   someone had complained about the work environment, and
19   the first time she was suspended for, I think, a month,
20   and the second time she was suspended, they wasn't
21   going to let her come back from my understanding.

22       **DEPUTY DISTRICT ATTORNEY LIM:**  And I apologize,
23   also for clarification, this is my ignorance, if the
24   commission could ask Mr. Reed what the work
25   environment, what that means that they weren't being
26   treated properly or that she wasn't maintaining a
27   proper work environment?

1          **INMATE REED:** She -- she's a feisty person,

2    and, you have 25 guys in the program, and to be a

3    supervisor for 25 people and you have deadlines, you

4    had to get these materials out, packaged up and out

5    because the company would send the guy over. We would

6    get orders, and we had to fill those orders, and she

7    only had a certain amount of time to get those orders

8    filled, and sometimes she would just be a little rough

9    on the guys, and this particular guy felt he was being

10    picked on because he wasn't keeping up.

11          **DEPUTY DISTRICT ATTORNEY LIM:** And the final

12    question, if the commission could consider asking Mr.

13    Reed what is Miss Hall's date of birth?

14          **PRESIDING COMMISSIONER SHELTON:** Good question.

15          **INMATE REED:** Miss Hall's birth -- I'm not sure

16    of the year, but her birth date is 9/26.

17          **PRESIDING COMMISSIONER SHELTON:** How old is

18    she?

19          **INMATE REED:** She's ten years older than I am,

20    so I believe it's 49.

21          **DEPUTY DISTRICT ATTORNEY LIM:** Thank you.  I

22    have no further questions. Thank you, Mr. Reed.

23          **PRESIDING COMMISSIONER SHELTON:** Mr. Carbone?

24          **ATTORNEY CARBONE:** Just a few. Thank you,

25    Commissioner. Mr. Reed, I want to go back to your

26    priors. You have one charge that was dismissed and

27    then possession of the weapon. In reviewing those

60

1    priors, do you see any of the seeds or the same reasons
2    why those crimes were committed as opposed to your
3    instant offense?

4        **INMATE REED:**  Yes.

5        **ATTORNEY CARBONE:**  Would you please explain?

6        **INMATE REED:**  The same thing he calls, the my
7    prior arrests for carrying a concealed weapon was the
8    very same thing that caused the killing of Mr. Bates,
9    and that is my addiction, and it is my, the depression
10   that I was up on there at the time.  I was a depressed
11   person because I didn't feel like I could make it in
12   society.  I had given up, and drugs and alcohol was my
13   whole life, and as I said earlier, it caused me to lose
14   a number of jobs and it just got worse and worse and
15   worse and it was the same thing that caused this
16   incident to happen.

17       **ATTORNEY CARBONE:**  And apparently after being
18   arrested for carrying the concealed weapon, were you
19   not able to heed that white flag or red flag that was
20   being waved in your face with respect to becoming clean
21   and sober.  Why do you believe that was so at the time
22   that you were incapable of heeding the call that
23   society was attempting to give you?

24       **INMATE REED:**  These were signs that I should
25   have taken heed to but I couldn't because I had shut
26   down.  I didn't allow myself to think anymore.  I
27   wasn't thinking clearly, and all I wanted to do was get

61

1    high and so as a result I didn't heed the -- I didn't
2    pay attention to the flags that were being waved in my
3    face.

4         **ATTORNEY CARBONE:**  I want to take you up to the
5    instant offense.  It indicated you chose your victim by
6    his vulnerability.  What do you think about that today?
7    Selecting your victim was they were particularly
8    vulnerable?

9         **INMATE REED:**  I think it was something that was
10   horrible.  I think that -- that -- that my behavior
11   then was based solely -- I place it squarely on the
12   shoulders of my addiction.  My life had, step one, had
13   become totally unmanageable and I was paralyzed from
14   the -- from my use of alcohol and drugs.  I know that
15   the killing, the killing of an innocent -- this was an
16   innocent man that had done me nothing -- done me no
17   harm, someone I didn't know, but I felt that he was
18   wronged because he was soliciting a prostitute and he
19   was an easy mark.  Today, it's unacceptable.

20        **ATTORNEY CARBONE:**  Let me ask you, you had
21   indicated earlier that your brother had forgiven you
22   for involving you in this crime; is that correct?

23        **INMATE REED:**  Yes.

24        **ATTORNEY CARBONE:**  And we discussed with the
25   Deputy Commissioner that the family of the victim has
26   also forgiven you for this crime.  Is that also
27   correct?

62

1    **INMATE REED:** Yes.

2    **ATTORNEY CARBONE:** Do you believe that you are
3    deserving of the forgiveness of your brother and the
4    family of the victim?

5    **INMATE REED:** No, I don't. No, I don't. I
6    don't believe -- what I did to my brother what I did
7    the Bates family can never, ever, be corrected. No
8    matter how many programs I get involved in, no matter
9    how much self-help I do, none of this can ever bring
10   Mr. Bates back. None of this will ever give back my
11   brother time with his son or his son with him, but what
12   had has done is allowed me the opportunity to better
13   myself and to ensure that nothing like this ever
14   happens again.

15   **ATTORNEY CARBONE:** Now, in the past, Mr. Reed,
16   you had equivocated on whether the shooting was a
17   consequence of an accident as a product of you being
18   nervous or whether you intended to kill the victim. A
19   two part question, part one, did you intend to kill the
20   victim or not? Part two, why had you equivocated in
21   the past about that?

22   **INMATE REED:** I didn't set out to kill anyone.
23   In my mindset at the time, and I was high. I wanted
24   drugs, and the only thing on my mind was achieving that
25   by any means I could. I chose to pick up a loaded
26   firearm and point it at another human being. My
27   mindset, in the past, has been that I didn't intend,

63

1    and because I didn't intend, I thought that telling the
2    truth in the way that I seen it at the time, but that
3    was through my, even through my addiction, when I was
4    addicted and waking up out of that, the embarrassment
5    of what I did, the shame of what I did because, again,
6    as I've said, stated earlier, I was not raised this
7    way.  My father work hard.  My mother was a stay-at-
8    home mom and minister and raised us much better than
9    that, and it was embarrassing, my behavior and I
10   believe that because of my embarrassment, I'm ashamed
11   of what I did is what I have held onto, which was the
12   incident of my not intending to shoot Mr. Bates.

13          **ATTORNEY CARBONE:**  Let's move on.  Briefly, I
14   understand that you were not written up for this over
15   familiarity incident.  Do you believe that you should
16   have been written up?

17          **INMATE REED:**  Yes, I probably should have.  I
18   probably should have been written up.  It is against
19   the rules of CDC to get involved in an over familiar
20   relationship with a staff member.

21          **ATTORNEY CARBONE:**  And given that same
22   situation if it were to present to you today, how would
23   you deal with it?

24          **INMATE REED:**  Oh, by no means I would allow
25   myself to get caught up in that manner emotionally as a
26   boundary, and I believe today that I wouldn't, I
27   wouldn't cross that line.

64

1      **ATTORNEY CARBONE:** And so why did you decide
2   not to discontinue your relationship with your present
3   fiancée based upon that?

4      **INMATE REED:** Well, because there have been
5   over the years a lot of people who have gotten involved
6   with staff members and relationships fall apart. I
7   didn't want to be one of those, for one. And then, I
8   love her, and I believe that we could have a future
9   together.

10     **ATTORNEY CARBONE:** What do you think is the
11  single worst failure of your life, sir?

12     **INMATE REED:** The single worst failure of my
13  life is the night I pulled the trigger.

14     **ATTORNEY CARBONE:** What's your single greatest
15  accomplishment?

16     **INMATE REED:** My single greatest accomplishment
17  has been working on myself to become a productive
18  member of society, someone who is responsible, becoming
19  the man that my parents wanted me to be.

20     **ATTORNEY CARBONE:** I have no further questions.
21     **PRESIDING COMMISSIONER SHELTON:** All right.
22  Before we go into closing statements, I want to let you
23  know that we sent out letters to agencies that are
24  called 3042 notices.

25     **INMATE REED:** Uh-huh those go to agencies that
26  might have an interest in your case. That is why Mr.
27  Lim is here and your attorney. We've received no other

65

1    responses to those letters.  The final portion of this
2    hearing before we recess for deliberations will be
3    closing statements.  And first Mr. Lim will go followed
4    by your attorney, and, Mr. Reed, if you would like to
5    make a statement as to why you think you're suitable
6    for parole, you may, or you may defer to your attorney.
7    All right.  Mr. Lim?

8         **DEPUTY DISTRICT ATTORNEY LIM:**  Thank you,
9    Commissioner.  First of all, I would like to say that
10   the people for the Alameda County District Attorney's
11   office continue to object to parole of the inmate, Mr.
12   Reed, at this time.  We feel that, first of all, the
13   commitment offense was such a violent, callous and
14   premeditated nature as to be unreasonable risk to the
15   public at this time.  Second, we feel that Mr. Reed's
16   future plans are not sufficiently detailed and have
17   some -- raise some serious concerns also to public
18   safety, which I'll address in a minute.  We also feel
19   that his recitation of the commitment offense has some
20   inconsistencies in it that show us that has not yet
21   fully come to grips with the commitment offense and is
22   expressing true remorse and regret for the offense.
23   First of all, I would note that at no time today in
24   reciting the commitment offense does he mentioned the
25   fact that is listed in the -- excuse me, in the
26   District Attorney's initial letter to the probation
27   department, which is included in the inmate's packet,

66

1    that at one point Mr. Reed and his brother forced
2    another young woman on to the street, some type of
3    customer for an act of prositution that they asked her
4    to take her customer to a predetermined location where
5    they did rob him.  The young woman flagged down a man
6    who turned out to be a plainclothes police officer so
7    that robbery plan failed.  Nowhere in Mr. Reed's
8    recitation of events does he indicate that at an
9    earlier time they had spotted another potential victim
10   but, in fact that victim turned out to be a
11   plainclothes police officer.  His statement to the
12   commission today indicates that, you know, he expresses
13   remorse for his acts to the eventual victim but that it
14   was the product merely of alcohol and drugs and these
15   letters from the District Attorney's office at the time
16   of the offense, who actually did the trail indicate
17   that there was more sophistication and planning and
18   that until Mr. Bates addresses these issues and comes
19   forth fully in terms of his entire participation that
20   night as opposed to saying that it was just drugs and
21   alcohol and confusion and that everything was hurried
22   and give a more expansive explanation of the entire
23   time line of events that night, we feel that what he is
24   saying is not entirely true, although he is obviously
25   to be commended for taking steps that he's made so far
26   to now saying that, yes, indeed, he did pull the
27   trigger as opposed to the gun going off, so we do

1    acknowledge that he's made some progress, but has not
2    taken full steps in that regard.  Second, we would
3    point out that at the time of the offense, he was under
4    court probation in the Alameda County Superior Court
5    for a misdemeanor offense of driving under the
6    influence.  He had an offense involving substance
7    abuse.  I cannot speak quite honestly about what the
8    exact terms of probation, I don't know if back in 1982
9    a term of probation included AA or substance treatment.
10   I think we probably can find that.  I do know that a
11   standard term of probation was even back then was to
12   obey all laws and avoid misconduct and that Mr. Reed
13   was under court supervision at the time.  I think it
14   speaks volumes that he's now seeking to go back out
15   into the public under another type of supervised
16   release and that his first efforts to do so back in
17   1982 had disastrous consequences for public safety.
18   Finally, we would object in regards to his future
19   plans, particularly his future plans with Miss Shirley
20   Hall.  Our office was not able to find much background
21   in the way of Miss Hall mainly because the name Shirley
22   Hall is a very common name, and so I apologize to Mr.
23   Reed for the question through the commission, it wasn't
24   a trick question to see if he was really in love with
25   Miss Hall.  We don't doubt that he is in love with Miss
26   Hall and that they have a genuine relationship, but
27   until the question of date of birth wasn't trying to

68

1   trick him up.  It was mainly to get a date of birth so
2   for future hearing we can have more information on Miss
3   Hall, but our future plan is you have here a woman who
4   was volunteering in the CDC and who aided and
5   encouraged Mr. Reed to skirt CDC rules by providing a
6   telephone number, you know, encouraging to use a
7   fictitious name in telephone conversation to encourage
8   him to continue a relationship.  I realize that that is
9   not on Mr. Reed particularly, but it is a concern for
10  us that if Mr. Reed is paroled, we all need support in
11  our lives and Mr. Reed would be socializing and using
12  as his support someone who in the past has flagrantly
13  flouted the rules of the CDC and encouraged an inmate
14  to flout those rules.  I'm not suggesting that the
15  parole make a recommendation that if Mr. Reed is to be
16  paroled that we would suggest that he should have to
17  terminate his relationship with Miss Hall.  I'm saying
18  just the opposite.  If Mr. Reed is going to continue
19  this relationship because he's in love, the more power
20  to him, but he's going to have to be ten times stronger
21  than somebody who is coming up for a date who's not
22  going to have -- because in our mind, he's not going to
23  have the best support group available to him in the
24  public to help him steer clear of the trouble and the
25  temptations that he would face out in the general
26  public because Miss Hall, through her actions, shows
27  that she is someone who may put personal items above

69

1    the well being of people around her. And with that, we

2    would again, object.

3        **DEPUTY COMMISSIONER STAR:** Okay. Hang on while

4    I change the tape everyone. Okay. Side B, Tape 2, for

5    Jesse Reed. We're back on record.

6        **PRESIDING COMMISSIONER SHELTON:** All right. We

7    just finished the closing statement from Mr. Lim. Mr.

8    Carbone?

9        **ATTORNEY CARBONE:** Thank you, Commissioners,

10   and thank you for your careful and thoughtful

11   consideration. I was very impressed with how detailed

12   and thorough you were in discussing the parole

13   suitability for Mr. Reed. Let me start very quickly

14   with the District Attorney's two concerns, and then

15   I'll go to my closing. First, underlining the District

16   Attorney's concern is that he did not, that Mr. Reed

17   did not discuss the robbery or robbery attempt is an

18   insinuation is that he's not being candid and open and

19   honest with the Panel with respect to the commitment

20   offense. I don't think that's the Mr. Reed you heard

21   from today, and I don't think that's the Mr. Reed that

22   has lived a considerable amount of time inside prison

23   in term of his conduct. This is somebody who was

24   readily admitted not only today but in the past on

25   repeated occasions with a great deal of candor his full

26   responsibility for the crime. I think it was simply

27   one of the few, perhaps the only issue that all of us

1    neglected to mention, and I don't think we should read

2    into any omission by Mr. Reed in failing to discuss

3    that.   In fact, I think when you were talking about

4    some of his priors if I could have advised him on

5    anything it was almost cut to the chase.  He went into

6    a lot of detail about his priors, and I think nothing

7    that he had demonstrated wouldn't expect the same with

8    respect to that robbery.  With respect to Miss Shirley

9    Hall, that's a little bit more difficult.  I think what

10   we can infer from the situation is exactly what Mr.

11   Reed said, that he recognizes the wrongfulness of it.

12   He recognizes that he probably should have been written

13   up, and thirdly, he recognizes that if, given the

14   opportunity, he would not have engaged in that

15   particular relationship, but the rules of love do not

16   always obey the rules of rationality in life as we all

17   know.  Can we infer that Miss Hall is somehow not a law

18   abiding citizen?  Absolutely not.  There's nothing in

19   this record whatsoever, and it would be to defame her

20   to suggest that otherwise.  And I would also just

21   simply point out that she is one of three potential

22   stable and suitable residences available to him.  Let

23   me go to my closing.  What I did is I looked at the

24   last three panels, the initial and the subsequent, and

25   here what I saw.  2001, I suppose, is still that time

26   when they were having three commissioners preside over

27   a Panel, so he had the benefit of having both

71

1    Commissioner Welch and Daily, as well as a Deputy
2    Commissioner look at his case closely, and here's what
3    they said. It was an unusual hearing. They gave him a
4    two-year denial. And, in fact, Welch commented at the
5    time that it was an unusual hearing, that most inmates
6    do not receive a two-year denial. The reason was Mr.
7    Reed. He was described as to have been doing an
8    outstanding job in 2001. He had excellent parole plans
9    at the time. In fact, Commissioner Welch said
10   something that I've never seen from a, at an initial
11   hearing, which is quote, "I have little doubt that you
12   will get a parole date," end quote. That's a pretty
13   striking thing to say to someone at an initial hearing,
14   and I know the Panel tries to encourage inmates and
15   that's appropriate, but I don't think this was kind of
16   a gratuitous comment by Commissioner Welch, especially
17   having the significance of having heard it at an
18   initial hearing. The denial in 2001 rested, I believe
19   on the severity of the crime and on the amount of time
20   that the inmate had not done. In 2003, before
21   Commissioner Bryson, I believe that the denial rested
22   squarely on a concern that Mr. Reed was not doing
23   enough in the area of substance abuse programming.
24   Just a footnote, I think that since '03 and perhaps
25   even before that, Mr. Reed followed that directive
26   quite closely, and if you look at his in-custody
27   history subsequent to that '03 decision, you'll see

72

1    that he immediately started to recommit himself to that

2    substance abuse counseling, not because he was jumping

3    through a hoop, necessarily, to get a parole date

4    because I think he saw realistically the importance of

5    those type of programming to tailor his rehabilitation.

6    In '05 before Commissioner St. Julian, I believe the

7    denial rested almost exclusively on the crime with the

8    Deputy Commissioner pointing out that he needed

9    additional time, and I think it was the elements of

10   those two factors. It almost looks, if you start

11   reading the end portion of the decision that they're

12   almost intimating that they're starting to calculate a

13   term for him because I believe, at that time, the

14   commissioner saw that he was quite close to receiving a

15   date. I would certainly agree with all past panels

16   that he is quite, was, at that time, quite close to

17   receiving a date for reasons that I'll get into, I

18   think he has reached that point. But let me say what I

19   also agree with the Panel, and I think more

20   importantly, Mr. Reed agrees with the Panel, and that's

21   on the horrendous nature of the crime. This was

22   undoubtedly a horrible crime that did not have to

23   occur. The District Attorney used the term

24   premeditated, and we understand this is a first degree

25   case. However, I think the facts don't necessarily

26   conform that a person high on heroin and cocaine

27   looking to do robberies to fuel a drug habit is

73

1    necessarily what one would think of as a normal,
2    premeditated crime. So, obviously, we would
3    respectfully disagree with that. More importantly,
4    however, this is a crime, I think, that dating back to
5    1989, is the earliest memorialization that I could find
6    of it that he, wherein the psych report, his violence
7    potential was rated as average based upon his
8    understanding of the crime. You take that, look at his
9    psych report in '91 where his prognosis is average, his
10   decreased violence potential, again, based upon his
11   understanding and his lack of understanding in 91,
12   because in that psych report in '91, you see that he's
13   still having problems ferreting out whether this was,
14   in his mind, an accident verses his utter indifference
15   at best and at worst, his intent to kill. I think you
16   bring that along the evolution of his understanding and
17   you begin to see, especially in '01 in the Jeko report
18   and in '05 with great clarity that he is described as
19   being distressed and horrified at his actions. He's
20   also described as having understanding regarding the
21   significance of the events and the crime and not
22   minimizing, not only the loss to the victim, but you
23   see his acceptance, responsibility, I think, in a very
24   poignant way to his brother's son. He understands the
25   real significance is what the Board often calls that
26   perhaps that rippling effect. And so, I agree with the
27   psychiatrist in '05 that his thought process and

74

1    emotional responses demonstrate insight, emotional
2    maturity and compassion. Those are the records of the
3    psych report. With respect to something also, I think,
4    perhaps this is a good time to mention that the DA
5    intimated on his gun training that he should have known
6    better in terms of having gun safety training. I
7    think, certainly, someone high on heroin and cocaine,
8    even a well-trained sharp shooter on heroin and cocaine
9    is not going to be thinking as logically and clearly
10   about the use of a firearm. Something else that Mr.
11   Reed enjoys and hopefully this is a reflection of the
12   good work that he has done and I believe it's true
13   because if you look at the letter of forgiveness by the
14   family, this was not just something that they did
15   because of their, their courage and their sensitivity
16   and compassion. It was also done because of Mr. Reed's
17   conduct and they took that into consideration. And so
18   I do believe that he is -- he says he doesn't
19   necessarily understand why they were able to forgive
20   him, but it is based, at best in part on his mindset
21   and his skill set and his in-custody history and what
22   he has done since being incarcerated. Let's talk about
23   his sobriety for a moment because that's relevant to
24   his in-custody history. It was a concern in '03. I've
25   already mentioned that he went back to that in an
26   unwavering fashion. I think you can gauge the
27   sincerity of his sobriety, given the fact that he was

1    clean and sober from literately day one when you asked

2    him, Commissioner, when did you become sober, it was

3    the night that he was arrested.  I don't think you get

4    any clearer in his understanding in his mind how

5    seriously he understood what he had done and the

6    significance of his sobriety even though that was not

7    the only causative factor, and I think he's mentioned

8    that as well, his lack of self-esteem.  He gave up on

9    himself, his depression, his sense that because he had

10   to work harder at something, he was somehow a failure.

11   I think all of those ultimately led into the various

12   causative factors, and I think he's demonstrated

13   insight on that as well.  He's, since his last

14   appearance, as pointed out by the Deputy Commissioner,

15   he's worked hard on the Project IMPACT and that he has

16   truly learned some things, and I, again, I think he was

17   poignant on, this, thing that, perhaps, all of us to a

18   greater, or lesser degree suffer from, this mask verses

19   the reality.  So he has been working his programs quite

20   sincerely and genuinely along with his sobriety.  One

21   of the other thing I'll note about him is you see a

22   pattern of people who come into contact with him,

23   whether it's the singing, or whether it's his

24   vocational work.  They take so much confidence in him

25   that they want to support him in the future, and I

26   think that speaks volumes of his character overall

27   self-help is quite impressive.  I won't be

76

1    representative. The Deputy Commissioner was very
2    thorough in that record. I will spend a second on his
3    choice of the electronic data processing. I think
4    rather than shy away in the past from challenges, he
5    saw challenges as opportunities to grow and that's why
6    he purposely selected that vocation because he knew it
7    was going to be a hard one, and he knew it would
8    require him to study extra hard, and he did so. He's
9    obtained his AA degree, and he's going to continue with
10   his education, he's indicated on the outside. He has
11   no 115's whatsoever, zero. And he's been free of
12   administrative counseling chronos since 1988, and we
13   wouldn't be talking seriously about his parole
14   suitability unless that, of course, was the case. In
15   '01, his parole plans were described as quote
16   excellent. I think they have become even stronger.
17   Maybe three is the magic number for him because he has
18   three jobs potentiality, offers of job potentialities
19   and three residence plans -- with Branch, with the
20   gospel recording, and with Cooper Roofing. With
21   respect to parole residences, he has his mother, his
22   aunt, and his fiancée. They're all realistic, they're
23   local, they're stable, and they're in proximity to his
24   employment. He also shows insight with respect to
25   understanding that he's going to have to maintain his
26   sobriety, his NA participation. He enjoys community
27   support. And, so based upon that entire record of

77

1    fact, we believe that he has reached that critical time
2    where both the amount of time and his suitability are
3    now mirroring one another; and, based upon that, we
4    would respectfully request that you find him suitable
5    today.  Thank you.

6    **PRESIDING COMMISSIONER SHELTON:**  Thank you.
7    Mr. Reed, would you like to make a statement?

8    **INMATE REED:**  Yes, briefly.  I know that
9    there's nothing I can say today or any other day, for
10   that matter, that, which will make any sense as to how
11   this crime occurred.  All I can offer is the truth, and
12   this is something I have done, I have tried to do since
13   day one.  I never denied this part in this crime.  I've
14   taken full responsibility for what I did, the bad
15   choices that I made October the 25th, 1984.  The one
16   thing that has -- that the thing which has changed for
17   me is that I, today, I do understand why my life
18   spiraled out of control.  I do understand the
19   significance of the crime and all of it's
20   ramifications.  Jacqueline Tabert (phonetic), when she
21   sentenced me, she said, Mr. Reed, I hope you take this
22   little time, she said, little time, and use it to help
23   people as opposed to hurting people.  That has never
24   left me.  That has stayed with me all of these years.
25   And I've tried to better myself.  I've tried to tailor
26   myself help around the things that cause me to commit
27   this crime, turn around my depression, an opportunity

78

1    to deal with my alcohol and drug use, an opportunity to
2    address my low self-esteem. I've tailored it to deal
3    with the lack of positive influences in my life. I've
4    tried to surround myself with people who are positive.
5    I realize that I was in school growing up and when I
6    went to college that I was in a place where I needed
7    help and didn't know how to ask for it. I understand
8    today that the only thing that I can ask for help today
9    and that the only dumb question is a question that is
10   not asked. I'm not ashamed to ask for help today.  In
11   my years here in prison I've grown in knowledge. I've
12   matured. I'm not that 23-, 24-year-old kid, young man
13   that was running around living to get high from one day
14   to the next, from one minute to the next. I wanted to
15   party and have a good time all the time. I regret the
16   choices that I made back then, not just in 1984, but
17   starting around 1978 when I first started using drugs.
18   I know that none of the thing I've said and none things
19   I've done will never ensure that I'll receive a date or
20   be found suitable for parole or take away anything that
21   I've done, take away what I did that night. But I pray
22   that the state of California will forgive me and give
23   me an opportunity to continue to be a positive
24   influence. I know that being on the outside, it's not
25   easy. I understand that. There's nothing easy about
26   it. I know that I will face challenges out there, hard
27   challenges. But my greatest desire at this time is to

79

1    be a help in my community, to be a help to my family,

2    to maintain positive employment, and someway, somehow

3    as time goes on and I'm comfortable with the

4    achievements that I've made in that area to one day

5    reach out and help other people.  That young man that's

6    sitting out there that may be feeling the same way that

7    I feel, that he can't succeed, that he can't measure up

8    and just needs someone to offer him some help.  I'll

9    help pull him in another direction.  I will not give up

10   on him standing in a fight if he changed his life.

11   Pray -- I've asked for forgiveness from the Bates

12   family and I've asked for forgiveness from my family,

13   and today I ask for forgiveness from the State of

14   California.

15           **PRESIDING COMMISSIONER SHELTON:**  Thank you,

16   sir.  We will recess for deliberations.  The time is

17   about 10:55 just about, and we'll have everybody back

18   here shortly.

19                       **R E C E S S**

20                         --oOo--

21

22

23

24

25

26

27

80

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3       **DEPUTY COMMISSIONER STAR:** Okay. We are back

4  on record.

5       **PRESIDING COMMISSIONER SHELTON:** All right,

6  everyone. We are back in the matter of third

7  subsequent parole consideration hearing for Jesse Reed,

8  R-E-E-D. CDC number D as in David, 07717. The time is

9  11:45 a.m. Mr. Reed, the Panel has reviewed all the

10 information we've received and we've relied on the

11 following circumstances in concluding that you are

12 suitable for parole.

13      **ATTORNEY CARBONE:** That's great.

14      **PRESIDING COMMISSIONER SHELTON:** And you would

15 not pose an unreasonable risk of danger to society or a

16 threat to public safety if released from prison.

17      **ATTORNEY CARBONE:** That's fantastic.

18      **PRESIDING COMMISSIONER SHELTON:** Now we need to

19 talk. Before I dive into this formal decision that

20 we're always required to make, there are some things I

21 want to get on the record that we brought into some

22 serious consideration. And, of course, those were, you

23 know, comments that the Deputy District Attorney made

24 because we always have great respect for the facts that

25 they bring into the case. Of a special concern to us

26 was your 2003 over familiarity situation with your

27 **JESSE REED    D-07717    DECISION PAGE 1    01/23/2007**

1    fiancée. And based more on Commissioner Star's

2    experience than my own, there was some concern in that

3    why there was no 115 or 128. Why were you put into Ad.

4    Seg.? So we re-devoured the file, and we could find

5    nothing that addressed that situation in any harmful

6    way to you whatsoever. Evidently, there was an

7    investigation done by the institution. There appeared

8    to be more concern about the difference between a DVD

9    player and a DVD recorder or something to that effect.

10          **INMATE REED:** A CD player.

11          **PRESIDING COMMISSIONER SHELTON:** Oh. Verses a

12    DVD player. We went through everything and because

13    that was one of our concerns. In the real world, you

14    potentially could have received a 115 in 2003 for that.

15    So we felt we did our homework. Commissioner, did you

16    want to add anything on that particular instance at

17    this time?

18          **DEPUTY COMMISSIONER STAR:** No. Just that

19    there's no formal by the Board -- I mean by the

20    institution relative to that. I have to conclude that

21    they did an investigation and they elected to take no

22    action. So without an action, I don't think the Board

23    can legitimately put much weight on the concern. I see

24    a lapse of judgment that you've admitted to, sir. The

25    seriousness of which is very difficult for the Board to

26    really weigh without some more formal write-up or

27    **JESSE REED**   D-07717   **DECISION PAGE 2**   01/23/2007

82

1    action by the institution.  For whatever reason, it

2    does not exist, and so the Board will not consider it

3    as if it was a disciplinary action.

4         **PRESIDING COMMISSIONER SHELTON:**  With that

5    being said, I'm going to move forward with this

6    decision and when we get to the numbers section, the

7    two of you can follow along there.  But, first of all,

8    I want to go to why we believe you are suitable for

9    parole.  First of all, Mr. Reed, you have no juvenile

10   record, much less one of assaulting anyone.  We feel

11   that your social history was stable until you became

12   addicted to the use of alcohol and drugs.  Your family

13   was close.

14        **INMATE REED:**  Yes.

15        **PRESIDING COMMISSIONER SHELTON:**  You have a

16   large family that you're still close with.  Your

17   parents were upstanding, churchgoing people that really

18   wanted the best for all of their children, and they did

19   not fail you, you failed them.

20        **INMATE REED:**  That's right.

21        **PRESIDING COMMISSIONER SHELTON:**  And you have

22   managed, since that time, this appears to be a six-year

23   period in your life where you just fell down the tubes.

24        **INMATE REED:**  Right.

25        **PRESIDING COMMISSIONER SHELTON:**  You've managed

26   since the time of your arrest to develop and grow and

27   **JESSE REED    D-07717    DECISION PAGE 3   01/23/2007**

83

1    maintain stable relationships with other people in your

2    lives.  You haven't been a loner in the institution.

3    By all intents and purposes you have a passel of

4    support letters from community leaders.  And,

5    obviously, while you've been in prison, you've enhanced

6    your ability to function within the law.  And you

7    participated in -- I'm not going to get them all.  I

8    had a hard time keeping up with the Deputy Commissioner

9    today because your successes have been bountiful, but I

10   do want to enter on the record the fact that you did

11   receive your high school diploma in 1978.

12           **INMATE REED:**  Uh-huh.

13           **PRESIDING COMMISSIONER SHELTON:**  We talked to

14   some degree about your special ed needs and

15   requirements, and we were both quite impressed that you

16   received an AA degree at San Quentin, Patten University

17   in 2002 and completed that degree with a 3.5 GPA.

18           **INMATE REED:**  Yes.

19           **PRESIDING COMMISSIONER SHELTON:**  So for

20   somebody that dealt with special ed issues in high

21   school and grammar school, it's obvious to us that you

22   exercised due diligence with regards to that.  I would

23   also like to add that you plan to participate in the

24   Protestant ministries seminary school with the hopes of

25   becoming a chaplain some day.  But with regards to

26   self-help and treatment programs, I, too, am going to

27   **JESSE REED    D-07717    DECISION PAGE 4    01/23/2007**

84

1    refer to the Board report because the counselor
2    involved in writing this did an extensive job and I do
3    want to make sure that everybody is aware of the fact
4    that you participated in the squires program early on
5    and in the Cairos program.  Also, the Board program
6    over at Solano is considered one of the best in the
7    state, and that's the victim offenders reconciliation
8    group, and I did have the pleasure the meeting the
9    gentleman that manages that program when I was there
10   two weeks ago, and it's got a waiting list well over 50
11   people.

12        **INMATE REED:**  Wow

13        **PRESIDING COMMISSIONER SHELTON:**  And
14   unfortunately they are Lifers -- I don't mean that the
15   way it sounded, but there's no limitation to the amount
16   of time that one can participate in that program, so
17   the waiting list just keeps growing.  Overcomers
18   Outreach, 12 step recovery, participated in a
19   fatherhood workshop, music and art, self-esteem
20   enhancement, ceremony for the 9/11 victims.  You've
21   continuously participated in Narcotic Anonymous and
22   some Alcoholics Anonymous, and very vigorously in the
23   IMPACT Programs, and I remember when you said about
24   that, image verses reality.  One of the hardest things
25   I think you'll have to deal with when you get out of
26   here some day, sir, is reality.  It's a different kind
27   **JESSE REED**    D-07717    **DECISION PAGE 5**    01/23/2007

85

1    Of reality than what you face in here. Ongoing, like I
2    said, IMPACT and NA, and academics. With regards to
3    vocation, you participated in a four-year course and
4    received your certificate of completion in the vocation
5    of electronic data processing in 1989, and we applaud
6    you for that as well as being able to secure employment
7    in your field of choice. You are currently working as
8    an R and R clerk. You've been involved in that for one
9    year. With regards to discipline, I have to commend
10   you. There are very few inmates that I've seen in my
11   experience of being a Commissioner that have received
12   zero 115's in their time in custody, and you have
13   received nine 128's, the last being in 1988, so,
14   obviously, to me, you have managed to get your life
15   back in order. And you had a good foundation early on
16   as a youngster, as a teenager, and I, you know, I'm not
17   trying to generalize, but I can't tell you how many
18   young men I've discovered in prison because they were
19   hero athletes and got involved in the party life style
20   and it got to be the cars and the girls and the drugs,
21   and the life style was more than they could handle.
22   Two weeks ago, I was involved with an outstanding young
23   football player, professional, same situation. We talk
24   about your electronics, your education, your self-help.
25          **ATTORNEY CARBONE:** Did you want to deal with
26   the supportive psych eval, Commissioner?
27   **JESSE REED**    D-07717    **DECISION PAGE 6**    01/23/2007

86

1        **PRESIDING COMMISSIONER SHELTON:**  Yeah, I'll get

2    there.  I got more to say before I go there.  We also

3    indicated that you committed or actually you lack

4    significant criminal history for a violent crime.  Now,

5    we did talk about the fact that you had a previous gun

6    charge.

7        **INMATE REED:**  Yeah.

8        **PRESIDING COMMISSIONER SHELTON:**  And, again,

9    found that to be related to your substance abuse issues

10   and drugs.  Now, I'm not putting that as an excuse for

11   you.

12       **INMATE REED:**  Right.

13       **PRESIDING COMMISSIONER SHELTON:**  Or a crutch or

14   whatever.

15       **INMATE REED:**  Right.

16       **PRESIDING COMMISSIONER SHELTON:**  But that was

17   in issue that we took a specific look at as well.  We

18   feel, because of your maturation and your growth and

19   your greater understanding that you have a reduced

20   probability of recidivism.  I don't want to go into the

21   advanced age in that I am older than you, and I'm not

22   that advanced yet, so we're not going there.  You do

23   have realistic parole plans.  You do have three

24   options, a residence, and you have three opportunities

25   for employment.  We did not receive a letter from your

26   fiancée with regards to housing.

27   **JESSE REED    D-07717    DECISION PAGE 7    01/23/2007**

1        **INMATE REED:** Yeah.

2        **PRESIDING COMMISSIONER SHELTON:** So at this

3    point in time, unless that turns up somewhere, probably

4    you need to be looking at residing with your mom or

5    Your aunt in terms of at least just getting settled in

6    once all this process gets through.

7        **INMATE REED:** Can she -- can she send it in to

8    you guys?

9        **PRESIDING COMMISSIONER SHELTON:** She can send

10   it to the Board and there is an investigative team that

11   goes out and examines housing prospects and employment

12   prospects.

13       **INMATE REED:** Okay.

14       **PRESIDING COMMISSIONER SHELTON:** And that's to

15   make sure that what you've told us is accurate, and

16   they go out and they do actual face-to-face

17   evaluations. And they can actually decide. And my

18   question would be, and I'm going to ask Mr. Lim, which,

19   your girl friend, your fiancée lives in a different

20   county is that correct?

21       **DEPUTY DISTRICT ATTORNEY LIM:** Yeah.  Marin

22   City is in Marin County.

23       **INMATE REED:** Marin County.

24       **PRESIDING COMMISSIONER SHELTON:** You've

25   maintained close family ties while in prison via

26   letters and visits.  That's obvious from the letter we

27   **JESSE REED    D-07717    DECISION PAGE 8    01/23/2007**

88

1    received.  I was touched by your conversation with your
2    nephew.  You have obviously maintained positive
3    institutional behavior since the day you arrived, and
4    we believe you show true signs of remorse, that you
5    understand the nature and magnitude of the offense and
6    you have accepted responsibility for that.  And feel
7    that you have demonstrated wanting to being or move
8    closer to being a good citizen in the community by your
9    comments about giving back and being instrumental and
10   changing people's lives.  A lot of people tell me that.
11   A lot of people tell me they want to go out and help
12   the youths of the world, but I didn't get the same kind
13   of nonchalance from you that I normally get.

14        **DEPUTY COMMISSIONER STAR:**  You want to change
15   it now?

16        **PRESIDING COMMISSIONER SHELTON:**  Yeah.  We have
17   to.

18        **ATTORNEY CARBONE:**  We don't want to have a
19   transcript failure at this point.

20        **DEPUTY COMMISSIONER STAR:**  We are on Tape 3,
21   Side A for Jesse Reed.

22        **PRESIDING COMMISSIONER SHELTON:**  All right.  I
23   was just finishing up with signs of remorse and insight
24   and I think that's all that I'm going to say there.
25   Now, per defense counsel's request, we'll move onto
26   psychological factors.  The psychological report we
27   **JESSE REED    D-07717    DECISION PAGE 9    01/23/2007**

89

1    reviewed two of them today.  The one completed in

2    December of 2005 was completed by Dr. Inaba, I-N-A-B-A,

3    and Dr. Inaba gave you a GAF score of 80.  GAF means

4    Global Assessment Functioning, basically, that tells us

5    he feels that you would handle your community situation

6    good, like a grade.  80 is like a B.  He also -- he

7    also --

8            **INMATE REED:**  She.

9            **PRESIDING COMMISSIONER SHELTON:**  She indicated

10   that you were a good candidate for parole.  She gave

11   you an Axis I, polysubstance abuse in full remission

12   and adult anti-social behavior by history.  So that was

13   a supportive psychological.  Dr. Jeko in March of 2001

14   also found you suitable for parole.  I do want to add

15   in here, sir, since it's something I may forget later,

16   the governor has an opportunity to over turn this

17   decision.

18           **INMATE REED:**  Right.

19           **PRESIDING COMMISSIONER SHELTON:**  And one idea,

20   is because your psychological is one year old right now

21   is if, in fact, the governor over turns this decision,

22   I've already made a request that you have a

23   psychological completed before your next hearing date.

24           **INMATE REED:**  Okay.

25           **PRESIDING COMMISSIONER SHELTON:**  That is so

26   there will not be a delay or a postponement.

27   **JESSE REED    D-07717    DECISION PAGE 10    01/23/2007**

1           **INMATE REED:** Right. Okay.

2           **PRESIDING COMMISSIONER SHELTON:** Because you

3   never know quite when the paperwork will come through.

4           **ATTORNEY CARBONE:** Thank you for that

5   foresight. We appreciate that.

6           **PRESIDING COMMISSIONER SHELTON:** I'm just

7   trying to be prepared there. Okay. Let's talk about

8   the numbers that you have in front of you. I'm going

9   to try to explain this as best as I can. The base life

10  offense for which you were convicted is murder in the

11  first degree with the use of a firearm. We did not

12  give you additional time for the use of a firearm

13  because you already served it.

14          **INMATE REED:** Okay.

15          **PRESIDING COMMISSIONER SHELTON:** So your time

16  in custody starts with the time of your commitment

17  offense, not with the time that you were received.

18          **INMATE REED:** Okay.

19          **PRESIDING COMMISSIONER SHELTON:** Because you

20  already had to serve time. You were received in June

21  of '85, but your life term didn't begin until January

22  of '86.

23          **INMATE REED:** Okay.

24          **PRESIDING COMMISSIONER SHELTON:** So just to let

25  you know, that's how that happens. The offense

26  occurred on October 24 of '84. What this means is we

27  **JESSE REED**   D-07717   **DECISION PAGE 11**   01/23/2007

```
 1    find you under 2403B, first degree murder, an offense
 2    committed on or after November 8th, '78.  That is part
 3    of that matrix process that we have to take into
 4    consideration at the time of the decision.  We look at
 5    the categories in the matrix and we established that
 6    you would fall under what's call a 3B category.  3
 7    being that you had no prior relationship with the
 8    victim.  B, that his death was almost immediate.
 9              INMATE REED:  Okay.
10              PRESIDING COMMISSIONER SHELTON:  Which gives
11    you a sentence of either 28, 29, or 30 years.  All
12    right.
13              INMATE REED:  Okay.
14              PRESIDING COMMISSIONER SHELTON:  28 is what
15    they call a mitigated term.  30 is what they call
16    aggravated.  And 29 is mid term.  We gave you the
17    aggravated term.
18              INMATE REED:  Okay.
19              PRESIDING COMMISSIONER SHELTON:  And the reason
20    for that is, I'll get into that in a second, but what
21    that boils down to is you take 30 years times 12
22    months, so you have a base offense of 360 months.
23              INMATE REED:  Okay.
24              PRESIDING COMMISSIONER SHELTON:  There were a
25    couple reasons that we aggravated it for.  First of
26    all, the victim was particularly vulnerable.  Two,
27    JESSE REED   D-07717   DECISION PAGE 12   01/23/2007
```

1    during the commission of the crime, had you a clear

2    opportunity to cease.  Three, the manner in which the

3    crime was committed created a potential for serious

4    injury to other person.  There was another lady in the

5    car.  And finally, you were on probation at the time of

6    the commitment offense.  So that gives the 30 years.

7    Are you with me so far?

8              **INMATE REED:**  Yes.

9              **PRESIDING COMMISSIONER SHELTON:**  So, then that

10   take us to that sheet there.

11             **INMATE REED:**  Uh-huh.

12             **PRESIDING COMMISSIONER SHELTON:**  Base term of

13   360 months.  We gave you post-conviction credits from

14   January 15th of '86, to when the life term started to

15   today's date.

16             **INMATE REED:**  Okay.

17             **PRESIDING COMMISSIONER SHELTON:**  We cannot

18   round up or round down, but you have served 21 years of

19   your life sentence.  So you get four months good credit

20   for each year you served without a 115.

21             **INMATE REED:**  Okay.

22             **PRESIDING COMMISSIONER SHELTON:**  Which means 21

23   years.

24             **INMATE REED:**  21.

25             **PRESIDING COMMISSIONER SHELTON:**  So that's

26   where the 84 months of good time credit came in.

27   **JESSE REED**    D-07717    **DECISION PAGE 13**    01/23/2007

1        **INMATE REED:**  Okay.

2        **PRESIDING COMMISSIONER SHELTON:**  You take the

3   84 months from the 360, and you need to serve 276

4   months.  That's your life commitment sentence.

5        **INMATE REED:**  Okay.

6        **PRESIDING COMMISSIONER SHELTON:**  You've served

7   21.  I do not know nor do we figure out how much time

8   you got credit for before you came here.  That will be

9   for the institution to fill out.

10        **INMATE REED:**  Okay.

11        **PRESIDING COMMISSIONER SHELTON:**  So on my

12   calculations, you still have two years to serve minus

13   whatever the pre-commitment time you served in the

14   county jail or whatever.

15        **INMATE REED:**  All right.

16        **PRESIDING COMMISSIONER SHELTON:**  Okay.  Now

17   with that being said, a couple of things.  First of

18   all, we have some special conditions of parole for you.

19   And they would include do not use alcoholic beverages,

20   submit to anti-narcotic testing, submit to THC testing.

21        **INMATE REED:**  Okay.

22        **PRESIDING COMMISSIONER SHELTON:**  Bottom line

23   is, do not drink, do not use drugs.

24        **INMATE REED:**  All right.

25        **PRESIDING COMMISSIONER SHELTON:**  And you need

26   to participate for the rest of your life in AA and NA,

27   **JESSE REED**    D-07717    **DECISION PAGE 14**    01/23/2007

1   and you need to follow whatever special conditions and

2   regular conditions that your parole agent would give

3   you.

4           **INMATE REED:**  Okay.

5           **PRESIDING COMMISSIONER SHELTON:**  A word of

6   advice, and I've seen this happen more times than not.

7   As excited as you may be about this, I have two

8   conditions to make -- or two comments to make.  First

9   of all, the buck does not stop with us.

10          **INMATE REED:**  Right.

11          **PRESIDING COMMISSIONER SHELTON:**  Two more

12  processes it needs to go through.  One is a legal

13  process where the I's are dotted and the T's are

14  crossed.  Make sure we did everything right.

15          **INMATE REED:**  Right.

16          **PRESIDING COMMISSIONER SHELTON:**  The next step

17  goes to the governor.  And the governor's staff will

18  review the case and they have 120 days to do so.

19          **INMATE REED:**  Right.

20          **PRESIDING COMMISSIONER SHELTON:**  And I cannot

21  speak for the governor, but he has his responsibilities

22  and his staff do, too, to make their judgment.  With

23  that being said, like I told you, if the date gets

24  reversed, don't let if get you down.

25          **INMATE REED:**  No.

26          **PRESIDING COMMISSIONER SHELTON:**  There's a few

27  **JESSE REED    D-07717    DECISION PAGE 15    01/23/2007**

95

1   gentlemen this week that have received dates two and

2   three times.

3           **INMATE REED:**  Right.

4           **PRESIDING COMMISSIONER SHELTON:**  And I saw one

5   last week that had received dates three times, and you

6   just can't give up.

7           **INMATE REED:**  Right.

8           **PRESIDING COMMISSIONER SHELTON:**  That's a

9   challenge that's being given to you, and you have to

10  decide how you want to handle it.  I'm just telling you

11  don't give up.

12          **INMATE REED:**  I won't.

13          **PRESIDING COMMISSIONER SHELTON:**  Finally,

14  before I be quiet and go let Commissioner talk.  As

15  excited as you are about this, there are your fellow

16  inmates who might not be so excited about this, and I

17  would caution you about saying too much about getting a

18  grant because I have seen inmates who have received

19  grants become sabotaged by other inmates.  I don't have

20  any recommendations for you as to how to handle that in

21  your own living environment, but I would caution you

22  that to exercise caution.

23          **INMATE REED:**  Okay.  Yeah.

24          **PRESIDING COMMISSIONER SHELTON:**  Commissioner?

25          **DEPUTY COMMISSIONER STAR:**  Nope.  Very

26  thorough.  Nothing to add.

27  **JESSE REED    D-07717    DECISION PAGE 16    01/23/2007**

96

1          PRESIDING COMMISSIONER SHELTON:   In other

2    words, she's saying I talk too much.

3          DEPUTY COMMISSIONER STAR:   In a polite way, I

4    hope.

5          PRESIDING COMMISSIONER SHELTON:   Mr. Reed, I

6    wish you all the luck.

7          INMATE REED:   Thank you.

8          PRESIDING COMMISSIONER SHELTON:   In the world.

9          INMATE REED:   Thank you.

10          PRESIDING COMMISSIONER SHELTON:   And some day

11    maybe I'll be listening to you sing some of that gospel

12    music.

13          INMATE REED:   I hope so.  I hope so.

14          PRESIDING COMMISSIONER SHELTON:   And nothing

15    else.

16          INMATE REED:   I love the gospel.  I live the

17    gospel.

18          PRESIDING COMMISSIONER SHELTON:   Good luck.

19    That concludes this hearing at 12:05 p.m.

20 ——————————————————————— A D J O U R N M E N T ————————————

21                         --oOo--

22

23    PAROLE GRANTED.
                              **MAY 2 3 2007**
24    THIS DECISION WILL BE FINAL ON:_____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    JESSE REED    D-07717    DECISION PAGE 17    01/23/2007

97

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, KERRY VIENS, a duly designated transcriber,

NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare

and certify under penalty of perjury that I have

transcribed tape(s) which total three in number and

cover a total of pages numbered 1 - 96, and which

recording was duly recorded at CALIFORNIA STATE PRISON,

SAN QUENTIN, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING of JESSE REED,

CDC No. D-07717, on JANUARY 23, 2007, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape(s) to

the best of my ability.

I hereby certify that I am a disinterested party

in the above-captioned matter and have no interest in

the outcome of the hearing.

Dated FEBRUARY 12, 2007 at Sacramento County,

California.

*Kerry L. Viens*

_____

Kerry Viens
Transcriber
**Northern California Court Reporters**

EXHIBIT "B"



## OFFICE OF THE GOVERNOR

June 22, 2007

*Via Facsimile and U.S. Mail*

Mr. Jesse Reed, D-07717
*California State Prison at San Quentin*
N170L
Post Office Box D-07717
San Quentin, California 94974

Dear Mr. Reed:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to reverse the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

LOUIS MAURO
Chief Deputy Legal Affairs Secretary

Attachment

cc: Board of Parole Hearings (w/attachment)

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**JESSE REED, D-07717**
**FIRST-DEGREE MURDER**

AFFIRM:                    _____

MODIFY:                    _____

REVERSE:                        X

On or about October 24, 1984, Jesse Reed and his brother, Gregory Reed, shot and killed Joe
Bates while attempting to rob him. That night, Jesse and Gregory planned to rob a prostitute or a
prostitute's customer. They forced a young woman onto the street to entice a customer, and they
instructed her to take the customer to a predetermined location. The robbery plan failed when
the young woman flagged down a plain clothes police officer.

As Jesse and Gregory continued searching for someone to rob, Jesse saw a prostitute get into a
truck with Joe. Jesse and Gregory approached the truck while Joe and the prostitute engaged in
sexual intercourse. Jesse opened the driver's side door, pointed a revolver at Joe and demanded
money. Joe replied that he did not have any money and begged Jesse not to shoot him. The
prostitute attempted to give Jesse $20, but she dropped the money. Jesse then shot Joe in the
heart, killing him.

Jesse Reed was arrested approximately one week later. A jury convicted him of first-degree
murder with the use of a firearm. According to the sentencing court, he was also convicted of
attempted robbery. He was sentenced to 25 years to life for murder, plus two consecutive years
for using a firearm. The court stayed the sentence for attempted robbery.

When he committed the murder, Mr. Reed was 24 years old. Although he had no juvenile
criminal record, as an adult he was convicted for carrying a concealed weapon and for drunk
driving. He was also on probation when he committed the life offense. Additionally, Mr. Reed
was arrested, but not convicted, for attempted robbery, disturbing the peace, trespassing, and
carrying a concealed weapon.

I have considered various positive factors in reviewing whether Mr. Reed is suitable for parole at
this time. Although he was counseled ten times for minor misconduct, he maintained a
discipline-free prison misconduct record. Mr. Reed, who was a high school graduate with some
college education prior to his incarceration for the life offense, made efforts in prison to enhance
his ability to function within the law upon release. He earned an Associate of Arts degree, and
he completed vocational training in data processing work. He held institutional positions such as
book binder, porter, photographer, and clerk. He availed himself of an array of self-help and
therapy, including Alcoholics Anonymous, Narcotics Anonymous, Squires, Kairos, Katergro,
Fatherhood Workshop, Overcomers Outreach 12-Step Recovery Group, Self Confrontation,
Alternatives to Violence, and Impact. He also took part in extracurricular activities, including

Jesse Reed, D-07717
First-Degree Murder
Page 2

participating in religious activities. He received favorable evaluations from various correctional and mental-health professionals over the years, and he maintains seemingly solid relationships and close ties with supportive family and friends.

Additionally, Mr. Reed made plans upon his release to live and work in Alameda County, his county of last legal residence. But because the 2007 Board granted Mr. Reed a parole-release date to occur in 2009, and there is no of way of knowing whether his housing and/or employment arrangements will still be viable at that time, his parole plans are not presently a factor weighing either in favor of or against his release.

Despite the positive factors I considered, the first-degree murder for which Jesse Reed was convicted was especially atrocious because it was carried out in a dispassionate and calculated manner. According to the District Attorney's 1985 Summary of Facts, after Jesse and Gregory failed at their first robbery attempt, they continued looking for someone to rob. Jesse admitted to the 2007 Board that when he opened the truck door, he "cocked the hammer back on the gun . . . ." Jesse also admitted to the Board that, "I did intend to kill him. I intended this whole thing to happen because when I picked up a loaded firearm and went out and pointed it at him, at another human being, I intended very much to harm him . . . ." According to the District Attorney's Summary of Facts, Joe begged for his life, and the prostitute attempted to give Jesse money, but Jesse nonetheless shot Joe once in the heart. Jesse had several clear opportunities to cease during this crime — such as after the first failed robbery attempt, and after Joe begged for his life — yet he chose to continue. The gravity of the first-degree murder committed by Jesse Reed is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk. The Alameda County District Attorney's Office and the Oakland Police Department agree, registering opposition to parole with the 2007 Board based, in part, on the gravity of the crime he committed.

The 2007 Board granted Mr. Reed a parole-release date to occur in 2009, at which time he will have served more than 24 years of his 27-years-to-life sentence. At age 47 now, Mr. Reed made some creditable gains in prison, including accepting responsibility for his actions and expressing remorse. But given the current record before me, and after considering the very same factors that the Board must consider, I find that the gravity of the first-degree murder committed by Mr. Reed presently outweighs the positive factors. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2007 decision to grant parole to Mr. Reed.

Decision Date: 6 / 6 / 2007

ARNOLD SCHWARZENEGGER
Governor, State of California

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**BOARD OF PAROLE HEARINGS**
DECISION PROCESSING AND SCHEDULING UNIT

P.O. Box 4036
Sacramento, CA 95812-4036



May 25, 2007


Jesse Reed D07717
California State Prison-San Quentin
San Quentin, CA 94964


Dear Mr. Reed:

Your parole consideration hearing was conducted on January 23, 2007. Decision Review is completed and the final decision date of your hearing is May 23, 2007. The decision has been approved by the California Department of Corrections and Rehabilitation, Board of Parole Hearings.

The decision finding you suitable for parole may be subject to review by the Governor.

Attached is the last "Decision Page" with the stamped final date and a front cover sheet to your transcript. Please incorporate these pages in your copy of the hearing transcript.

Sincerely,

Sandra De Maciel

SANDRA D. MACIEL
Chief, Decision Processing
and Scheduling Unit

Enclosure

cc:     Institution Records Office


tp

EXHIBIT "C"



## OFFICE OF THE GOVERNOR

July 12, 2007

Mr. Jesse Reed (No. D-07717)
San Quentin State Prison, 1-N-70
San Quentin, California 94974

Re: Public Records Act Request

Dear Mr. Reed:

You recently sent a Public Records Act request to Governor Schwarzenegger for "the Executive Case Summary that the Governor reviewed and used to reverse the grant of parole that the Board of Parole Hearings granted."

We have a copy of your executive case summary, but it is exempt from production under the Public Records Act. In particular, it is exempt under Government Code section 6254, subdivision (l), because the summary is "in the custody of or maintained by the Governor's Legal Affairs Secretary." The summary is also exempt as "correspondence of and to the Governor or employees of the Governor's office." (Gov. Code, § 6254, subd. (l).) Finally, our copy of the document contains handwritten notes, and those notes are additionally exempt under Government Code section 6254, subdivision (a) as "[p]reliminary drafts, notes, or interagency or intra-agency memoranda."

Your letter refers to *In re Elkins* (2006) 144 Cal.App.4th 475, in which the Court of Appeal ordered the State to disclose an executive case summary to a parole applicant. However, that case involved a discovery request made during litigation, not a Public Records Act request. As noted above, the Public Records Act contains exemptions that cover the executive case summary. The *Elkins* Court did not consider these exemptions, because they do not apply in the context of a discovery request. Thus, *Elkins* does not require the Governor to produce executive case summaries in response to a Public Records Act request.

Sincerely,

DANIEL P. MAGUIRE
Deputy Legal Affairs Secretary

GOVERNOR ARNOLD SCHWARZENEGGER • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

EXHIBIT "D"

ENDORSED
FILED
ALAMEDA COUNTY

JAN 2 5 2008

CLERK OF THE SUPERIOR COURT
By _____ FIL. R. CRUZ
Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF ALAMEDA**

In re

JESSE REED,

on Habeas Corpus

No. 80260A

ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS

This court having reviewed the petition for writ of habeas corpus ("Petition")
filed on August 22, 2007, by petitioner JESSE REED ("Petitioner"), the informal
response to the Petition filed by the Attorney General for the State of California on
September 27, 2007, and the informal reply filed by the Petitioner on October 12,
2007, NOW HEREBY ORDERS:

The Petition is DENIED for failure to make a prima facie case for relief.

The Information charged Petitioner with: special circumstance murder
committed during the commission of an attempted robbery, with use of a firearm and
great bodily injury clauses; and one count of attempted robbery, also with use of a
firearm and great bodily injury clauses. In 1985, a jury found Petitioner guilty of first
degree murder with the use clause, and found not true the special circumstance and
that Petitioner did not inflict great bodily injury on the victim during the murder.
Further, the jury found Petitioner guilty of the attempted robbery with the use clause,
but did not find that Petitioner had inflicted great bodily injury during the commission
of the robbery. Petitioner was sentenced to 25 years to life in prison with the
possibility of parole on the murder count, and two years consecutive on the use of a
firearm clause. Also, the trial court suspended imposition of sentence on the
attempted robbery pending completion of the sentence on the robbery, at which time
the suspension would be permanent. Petitioner was thus sentenced to a total of 27
years to life in prison with the possibility of parole.

At Petitioner's third subsequent parole hearing in January 23, 2007, the Board of Parole Hearings ("Board") found Petitioner suitable for parole. The Governor reviewed the Board's decision and reversed it in June 2007. The Governor's reversal was based solely on the commitment offense. Petitioner filed his petition seeking reversal of the Governor's decision, and reinstatement of the Board's order granting him parole. The Petition sets out the following grounds for relief: (1) the Governor's reversal violates the prohibition of *ex post facto* application of the law; (2) the Governor's decision was not based on the same evidence relied on by the Board thereby violating his due process; and (3) the Governor's decision was not based on "some evidence" and therefore violated Petitioner's due process rights. Petitioner has failed to meet his burden of making a prima facie relief on any of the grounds asserted.[1]

Petitioner contends that the Governor's reversal of the Board's grant of parole violates the ex post facto clause at the time of his conviction the Governor did not have the authority to review the Board's parole decisions. Our Supreme Court in *Rosenkrantz* rejected this very argument after a lengthy examination of the issue. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 636-652 (*Rosenkrantz*).) The court concluded that "[t]he governing authorities establish that the type of procedural change implemented by article V, section 8(b)--i.e., a change that simply created a new level of review, within the executive branch, of parole decisions concerning a specified category of prisoners (thereby changing the identity of the ultimate decision

---

[1] In his informal reply, Petitioner for the first time raises another ground for relief. He claims that he was denied due process when he was not allowed to be present when the Governor reviewed the Board's decision and reversed it. Because this ground was not expressly raised in the Petition, this court lacks the authority to grant relief based on this ground. (*Board of Prison Terms v. Sup. Ct.* (2005) 130 Cal.App.4th 1212, 1235.) Even if this court could consider this issue, the claim lacks merit and relief would nonetheless be denied. Petitioner cites no authority that a prisoner seeking to be paroled has a due process right to appear personally before the Governor. There is binding authority to the contrary. (See *In re Arafiles* (1992) 6 Cal.App.4th 1467, 1479-1481 (*Arafiles*) and *In re Elkins* (2006) 144 Cal.App.4th 475, 490 (*Elkins*).)

2

maker within the executive branch for such parole decisions), but that did not change the substantive standard governing the grant or denial of parole--is not the type of change to which the ex post facto clause applies." (*Rosenkrantz, supra,* 29 Cal.4th at p. 638.) Petitioner cites to *Garner v. Jones* (2000) 529 U.S. 244 in support of this contention. However, this case is not directly on point, and was considered and analyzed by our Supreme Court in *Rosenkrantz.* The other case cited by Petitioner is not on point and also predates *Rosenkrantz.* This court is bound by *stare decisis* to deny Petitioner relief based on this claim. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Petitioner's main contention is that there is no evidence to support the Governor's decision to reverse the Board's grant of parole and therefore his due process rights have been violated. "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code of Regs., tit. 15, § 2402, subd. (a).) Article V, section 8(b), to the California Constitution confers upon the Governor constitutional authority to review the Board's decisions concerning the parole of individuals who have been convicted of murder and are serving indeterminate sentences for that offense. (*Rosenkrantz, supra,* 29 Cal.4th at p.659 .) The statutory procedures governing the Governor's review of a parole decision pursuant to article V, section 8(b), are set forth in Penal Code section 3041.2. (*Id.*) The Governor's review, though de novo, must be restricted to the same factors which the parole authority is required to consider, and must conclude with a written statement of reasons for his decision. *(Rosenkrantz, supra,* 29 Cal.4th at pp. 625-626, 660-661, 667.) Further, as Petitioner correctly claims, the Governor's review of Board decisions is limited to a reexamination and consideration of the administrative record before the Board. (*Arafiles, supra,* 6 Cal.App.4th at p.1478.)

The Governor has discretion in the manner in which the specified factors relevant to parole suitability are considered and balanced, and the resolution of any conflicts in the evidence. The weight to be given the evidence is a matter within the

authority of the Governor. The evidence in support of the Governor's decision "'must have some indicia of reliability,'" (*In re Scott* (2005) 133 Cal.App.4th 573, 591 (*Scott*), quoting *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 915) and "'must have some basis in fact [.]'" (*Elkins, supra,* 144 Cal.App.4th at p. 489, quoting *Scott, supra,* 133 Cal.App.4th at p. 590.) The Governor can look at the circumstances of the offense and rely on the facts of the crime alone, so long as it points to factors beyond the minimum elements of the crime, in determining that a prisoner is unsuitable for release. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1070-1071 (*Dannenberg*); *Rosenkrantz, supra,* 29 Cal.4th 616.)

Our Supreme Court held in *Rosenkrantz* that "the judicial branch is authorized to review the factual basis of a decision of the [Governor] denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the [Governor] supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the [Governor] to vacate its decision [reversing] parole ...." (*Id.* at p. 658; see also *In re Lowe* (2005) 130 Cal.App.4th 1405, 1429; and *In re Smith* (2003) 114 Cal. App. 4th 343 370.) When reversal of a grant of parole is based solely on the commitment offense, such denial justifies especially close scrutiny, and denial based solely on this factor is permissible so long as the Governor does not fail to consider all other relevant factors. (*Scott, supra,* 133 Cal.App.4th at p. 595.) This court cannot reweigh the factors and substitute its judgment. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) The Governor's decision is subject to limited review under the "some evidence" standard of review. (*Rosenkrantz, supra,* 29 Cal.4th at p. 652.) Only a modicum of evidence is required. (*Id.* at p. 626.) Given that the sole basis for the Governor's decision is the commitment offense, and the length of Petitioner's

4

incarceration, this court has especially scrutinized the Governor's decision and the record on which it is based.

As the *Dannenberg* Court noted, "[t]he regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole. (Citation omitted).) Among the specified circumstances of the commitment offense that "tend to indicate unsuitability for release" are that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Citation omitted.)" *(Dannenberg, supra,* 34 Cal.4th at p.1080). In finding that Petitioner unsuitable for parole, the Governor found that the commitment offense alone outweighed the positive factors in support of a finding of suitability for parole. In his decision to reverse the grant of parole, the Governor's gave individualized consideration to all relevant factors in Petitioner's case. The Governor's decision goes into detail as to many favorable circumstances in support of parole, and he is not required to specify in detail every pertinent fact relied upon. (See *Elkins, supra,* 144 Cal.App.4th at p. 492, fn. 4.) Petitioner's general allegation about an Executive Case Summary ("ECS") that the Board provided to the Governor are insufficient to support the claim that the Governor reviewed additional evidence that was not part of the administrative record available to the Board. *(People v. Duvall* (1995) 9 Cal.4th 464, 474.) Neither of the cases cited by Petitioner are on point on this issue. Petitioner has not alleged any facts that would lead to a conclusion that the ECS is additional "evidence" or "record," rather than just a summary by the Governor's staff of the very same record available to the Board.

In finding that Petitioner would pose an unreasonable risks of danger if released on parole, the Governor specifically stated that the murder was exceptionally atrocious because it was carried out in a dispassionate and calculated manner. The key facts as detailed by the Governor supports the finding, have a basis in fact and are reliable based on Petitioner's own admissions at the hearing. (See unpublished opinion of *People v. Reed,* Court of Appeal, First District, Division Five, No. A031786.) Here, Petitioner and his brother went out in the early morning hours in

5

October 1984 with the intent to rob either a prostitute or the customer of a prostitute. That same day just prior to the offense, Petitioner had been involved in several abortive attempt rob a prostitute's customer. Then, Petitioner spied a prostitute get into a truck with the victim and drive away. Petitioner was driven to the location where the victim's truck had stopped. Petitioner and his brother approached the truck. Petitioner opened the truck door, and admits that he cocked the hammer back on the gun pointing it at the victim as he demanded money. The victim told him that he had no money and begged him not to shoot him. The prostitute attempted to hand Petitioner a \$20 bill but dropped it. Petitioner then shot the victim in the heart and the victim died at the hospital some time later that same morning. Thus, there is some evidence in support the Governor's finding that the offense was carried out in a dispassionate and calculated manner (Cal. Code of Regs., tit. 15, section 2402(c)(1)(B)), and implied finding that the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering (Cal. Code of Regs., tit. 15, section 2402(c)(1)(D)).

Petitioner does not offer any binding authority in support of his contention that the Governor's reliance on an immutable factor such as commitment offense to deny Petitioner parole violates due process because he did not use any more force than necessary to convict of first degree murder. This contention lacks merit. The Governor also relied on factors beyond the minimum elements of the crime. Here, Petitioner suffered a conviction of first degree murder. First degree murder is characterized by a lack of special circumstance justifying the death penalty or life without the possibility of parole. (*In re Van Houten* (2004) 116 Cal.App.4th 339, 352 (*Van Houten*).) There is some evidence that the murder occurred while Petitioner was engaged in the commission of a robbery, which is a special circumstance murder justifying, at a minimum, life without the possibility of parole.[2] (Penal Code §190.2,

---

[2] The fact that the jury did not find the special circumstance allegation true "beyond a reasonable doubt" does not prevent the Governor from finding that there is "some evidence" of the allegation. (See *Rosenkrantz, supra,* 29 Cal.4th pp.679-680.)

6

subds. (a)(17)(A), and (b).) Accordingly, the record contains "some evidence" that Petitioner's murder involved "particularly egregious acts beyond the minimum necessary to sustain" the conviction. (*Van Houten, supra*, 116 Cal. App. 4th at p. 353.)

The Governor's determination that Petitioner poses an unreasonable risk of danger to society if released because the murder was committed in an exceptionally atrocious relied upon facts beyond the minimum elements of first degree murder, took into consideration all relevant and reliable factors, and is supported by some evidence. Thus, the Governor's reversal of the Board's grant of parole does not violate due process.

DATED JAN 2 5 2008                          LARRY J. GOODMAN

                                            HON. LARRY GOODMAN
                                            JUDGE OF THE SUPERIOR COURT

EXHIBIT "E"

## RONALD HAYWARD, Petitioner-Appellant, v. JOHN MARSHALL, Warden, California Men's Colony East, Respondent-Appellee.

### No. 06-55392

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

### 2008 U.S. App. LEXIS 40

### June 8, 2007, Argued and Submitted, Pasadena, California January 3, 2008, Filed

### PRIOR HISTORY: [*1]

Appeal from the United States District Court for the Central District of California. D.C. No. CV-05-07239-GAF(CT). Gary A. Feess, District Judge, Presiding.

**DISPOSITION:** REVERSED AND REMANDED.

**COUNSEL:** Joseph V. Camarata, Vallejo, California, for petitioner-appellant Ronald Hayward.

Bill Lockyer, Attorney General of the State of California, Mary Jo Graves, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Jennifer A. Neill, Supervising Deputy Attorney General, Jane Catherine Malich, Deputy Attorney General, Los Angeles, California, for respondent-appellee John Marshall.

**JUDGES:** Before: Alex Kozinski, Chief Judge, Daniel M. Friedman, · and Ronald M. Gould, Circuit Judges. Opinion by Judge Gould.

 \*  The Honorable Daniel M. Friedman, Senior United States Circuit Judge for the Federal Circuit, sitting by designation.

### OPINION

GOULD, Circuit Judge:

California state prisoner Ronald Hayward has twice been granted a parole date by the California Board of Prison Terms ("Board"). · California's Governor has twice reversed the Board's determination that Hayward was suitable for parole. Hayward appeals the district court's denial of his petition for a writ of habeas corpus.

1  On July 1, 2005, [*2] California created the Board of Parole Hearings to replace the Board of Prison Terms. Cal. Penal Code § 5075(a).

I

On December 15, 1978, Hayward, with other members of the Vagos motorcycle gang, traveled to the Buccaneer Bar in Sierra Madre, California. There, he confronted a man who, according to conflicting accounts, had either slapped or battered and attempted to rape Hayward's girlfriend (who would later become Hayward's wife). The confrontation turned physical and ended after Hayward stabbed the man twelve times, killing him. In 1980, a California jury convicted Hayward of second degree murder, and the court sentenced Hayward to state prison for a term of fifteen years to life.

Hayward has spent the last twenty-seven years in prison. He is now sixty-four years old. He retired from the Vagos motorcycle gang in 1981. In the twenty-seven years Hayward has spent in prison, he has completed substantial vocational training in the fields of plumbing, mechanics, welding, meat cutting, and shoe repair. Hayward obtained a GED in 1981 and has developed typing and computer skills through job assignments in prison. For the last twenty years, Hayward has led prison tours for university students [*3] studying criminal justice. He has not had a major disciplinary violation in prison since 1989, and his last minor disciplinary infraction was in 1997.

Hayward initially denied responsibility for the murder that led to his imprisonment, claiming that he was at the scene, but that two of his friends had stabbed and killed the victim. However, during a parole hearing in 1993, Hayward admitted that he was responsible for the murder and has accepted responsibility for the crime ever since.

2 At his most recent parole hearing, Hayward explained his remorse for the crime: "I feel horrible. . . . I took somebody's life . . . . How do you ever adjust to that?" When asked if the victim deserved what he got because he allegedly attempted to rape Hayward's wife, Hayward responded: "No, Ma'am. No, he didn't. No one deserves that."

Before Hayward was sent to prison, he had a history of substance abuse. In a prison psychological evaluation, he stated the drugs he preferred to use were marijuana and cocaine, but that he no longer uses drugs. He stated that he stopped smoking marijuana in 1985, that he never purchased drugs himself, and that he only used drugs when they were available because someone [*4] else had them. He also reported that he used heroin in prison "a few times" but that "it scared [him] and [he] didn't like it." Hayward stated that he had not had a drink of alcohol since a 1974 conviction for driving under the influence.

Hayward has managed to stay free of drug use by taking advantage of therapy opportunities available to him in prison. Since 1997, Hayward has participated in Yoke Fellows groups. These groups follow a "spiritual twelve step" approach to help members overcome substance abuse problems. Hayward attends two Yoke Fellows group meetings per week. Hayward has also participated in the Project Change substance abuse program, has been a volunteer in the prison's Protestant chapel, and has completed a program entitled Alternatives to Violence.

In a 2002 psychological evaluation and at his 2003 parole suitability hearing, Hayward discussed what he would do if granted parole: He planned to move to Monrovia, California, where he would live with a friend, Robert Sharp. In Monrovia, Hayward had two job offers, one with a firm that builds golf carts and another to work as a laborer through the Teamsters Union. Hayward also said that his preferred option would be to [*5] obtain a transfer of his probation to Idaho, where he could be with his ailing parents, two of his daughters, and six of his grandchildren. Hayward believed that the family support he could obtain in Idaho would enable him to find employment. Hayward also noted that he has a carpenters' pension coming to him and that he should qualify for some social security benefits resulting from the death of his wife.

Dr. Erich Rueschenberg, who prepared the 2002 psychological evaluation of Hayward, concluded that "Mr. Hayward's prognosis for community living seems to be favorable," that "he appears to have a viable parole plan," and that he "appears to be a strong candidate for a favorable readjustment in the community."

On June 27, 2002, after Hayward's tenth parole consideration hearing, a two-member panel of the Board reached a split decision regarding Hayward's suitability for parole. The panel referred the decision to the en banc Board which found Hayward suitable for parole by a majority vote.

Then-Governor Gray Davis reviewed the Board's decision as article 5, section 8(b) of the California Constitution entitles him to do. ³ On January 10, 2003, the Governor reversed the parole grant, giving [*6] the following reasons for denying Hayward parole: (1) Hayward's crime was "particularly grave," premeditated, and perpetrated against an outnumbered, unarmed, and inebriated victim; (2) Hayward had refused to assume adequate responsibility for the victim's death; (3) Hayward had a "lifetime of escalating criminality and violence"; (4) Hayward had an unstable social history, including an extensive history of alcohol and substance abuse; (5) Hayward had been extensively involved in gangs, both inside and outside of prison; and (6) Hayward's psychological evaluators "remain[ed] convinced that he poses a danger to society."

   3  Article 5, section 8(b) of the California Constitution provides, in relevant part:

> No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required [*7] to consider.

A panel of the Board held Hayward's eleventh parole consideration hearing on June

19, 2003. In addition to reconsidering the evidence with which it had been previously presented, several letters were submitted to and reviewed by the Board at that hearing. Randy Cammack, the secretary/treasurer of Teamsters Local 63 wrote to indicate that he would support Hayward's efforts to find work if Hayward was granted parole. Robert Sharp, Hayward's best friend for forty-five years, wrote to say that, if released, Hayward could live with him and borrow his truck to get to work and for any other transportation needs Hayward might have. Clifford Rees, the president and owner of a company called California Golf Cars, wrote to offer Hayward an entry-level position with his company. Ralph Steelhead, who was a teacher and coach of Hayward's when Hayward was in junior high school (and is now a chaplain's assistant at the facility in which Hayward is imprisoned) wrote to offer his support. Pastor Warren Nielsen stated his belief that Hayward was ready for parole. Many other family members and acquaintances wrote to emphasize that they would be willing to offer emotional and financial support **[*8]** to Hayward as he readjusts to freedom.

Against the background of this redeeming presentation, the panel granted Hayward parole, concluding that Hayward would not pose an unreasonable risk of danger to society if released from prison. In its decision, the panel noted that Hayward had a stable social history, as evidenced by his stable relationships with his family, friends, and supporters. The panel found that, while in prison, Hayward had enhanced his ability to function within the law upon release by educating himself, receiving vocational training, and participating in therapy like the Yoke Fellows. The panel found that Hayward committed the 1980 murder as a result of significant stress in his life caused by the victim's attempted rape and violent beating of Hayward's future wife. The panel also found that the victim provoked Hayward by throwing a bottle at him on the night of the murder. The panel found that Hayward's parole plans were realistic and that he now understood the magnitude of and accepted responsibility for the murder he committed.

On November 10, 2003, the Governor again reversed the parole grant. Governor Davis cited the same factors as he had cited in his reversal **[*9]** of the Board's previous parole grant. In addition, the Governor cited the Los Angeles County District Attorney's opposition to Hayward's release from prison as further justification for his reversal of the Board's parole grant. [4]

> 4  The district attorney had not previously opposed parole for Hayward, and the record does not explain why the district attorney chose Hayward's eleventh parole suitability hearing to intervene.

After the Governor's second reversal of parole, Hayward filed a petition for a writ of habeas corpus in the Los Angeles County Superior Court. On June 30, 2004, the court denied the petition in a minute order. The court rejected many of the Governor's findings, particularly those regarding Hayward's failure to accept responsibility, his criminal history, and his unstable social history. Nonetheless, the court found that the Governor's decision to deny parole was supported by "some evidence." Hayward then filed a petition for a writ of habeas corpus with the California Supreme Court. That court denied the

19, 2003. In addition to reconsidering the evidence with which it had been previously presented, several letters were submitted to and reviewed by the Board at that hearing. Randy Cammack, the secretary/treasurer of Teamsters Local 63 wrote to indicate that he would support Hayward's efforts to find work if Hayward was granted parole. Robert Sharp, Hayward's best friend for forty-five years, wrote to say that, if released, Hayward could live with him and borrow his truck to get to work and for any other transportation needs Hayward might have. Clifford Rees, the president and owner of a company called California Golf Cars, wrote to offer Hayward an entry-level position with his company. Ralph Steelhead, who was a teacher and coach of Hayward's when Hayward was in junior high school (and is now a chaplain's assistant at the facility in which Hayward is imprisoned) wrote to offer his support. Pastor Warren Nielsen stated his belief that Hayward was ready for parole. Many other family members and acquaintances wrote to emphasize that they would be willing to offer emotional and financial support [*8] to Hayward as he readjusts to freedom.

Against the background of this redeeming presentation, the panel granted Hayward parole, concluding that Hayward would not pose an unreasonable risk of danger to society if released from prison. In its decision, the panel noted that Hayward had a stable social history, as evidenced by his stable relationships with his family, friends, and supporters. The panel found that, while in prison, Hayward had enhanced his ability to function within the law upon release by educating himself, receiving vocational training, and participating in therapy like the Yoke Fellows. The panel found that Hayward committed the 1980 murder as a result of significant stress in his life caused by the victim's attempted rape and violent beating of Hayward's future wife. The panel also found that the victim provoked Hayward by throwing a bottle at him on the night of the murder. The panel found that Hayward's parole plans were realistic and that he now understood the magnitude of and accepted responsibility for the murder he committed.

On November 10, 2003, the Governor again reversed the parole grant. Governor Davis cited the same factors as he had cited in his reversal [*9] of the Board's previous parole grant. In addition, the Governor cited the Los Angeles County District Attorney's opposition to Hayward's release from prison as further justification for his reversal of the Board's parole grant. [4]

4 The district attorney had not previously opposed parole for Hayward, and the record does not explain why the district attorney chose Hayward's eleventh parole suitability hearing to intervene.

After the Governor's second reversal of parole, Hayward filed a petition for a writ of habeas corpus in the Los Angeles County Superior Court. On June 30, 2004, the court denied the petition in a minute order. The court rejected many of the Governor's findings, particularly those regarding Hayward's failure to accept responsibility, his criminal history, and his unstable social history. Nonetheless, the court found that the Governor's decision to deny parole was supported by "some evidence." Hayward then filed a petition for a writ of habeas corpus with the California Supreme Court. That court denied the

petition without comment on July 27, 2005.

Hayward filed a petition for a writ of habeas corpus in district court on October 5, 2005. Hayward contended that Governor [*10] Davis's reversal of the Board's parole grant violated his right to due process of law. In her report and recommendation, the magistrate judge concluded that, under the United States Supreme Court's decision in *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979), and the California Supreme Court's decision in *In re Dannenberg*, 34 Cal. 4th 1061, 23 Cal. Rptr. 3d 417, 104 P.3d 783 (Cal. 2005), Hayward had no constitutionally-protected liberty interest in parole. The magistrate judge also explained that, even if Hayward had a liberty interest in parole, the Governor's reversal of the Board's parole grant was consistent with due process of law because "some evidence" supported the Governor's conclusion that Hayward posed an unreasonable risk to public safety if released. *See Superintendent v. Hill*, 472 U.S. 445, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985). Finally, the magistrate judge rejected Hayward's contention that the Governor had a "no-parole-for-murderers" policy and that such a policy violated Hayward's due process rights.

The district court then accepted the magistrate judge's recommendation that it deny Hayward's habeas petition with prejudice, and entered judgment on February 16, 2006.

5 Hayward has requested that we [*11] take judicial notice of two recent California Court of Appeal opinions. We construe the request for judicial notice as a citation of supplemental authorities pursuant to Federal Rule of Appellate Procedure 28(j), and the opinions shall be considered by us. We thus deny the request for judicial notice as moot.

## II

We review de novo the district court's denial of a habeas petition. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004). Because Hayward is in custody pursuant to a state court adjudication and because Hayward filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we cannot grant a writ of habeas corpus unless the state court's adjudication of Hayward's due process claim resulted in a decision that (a) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court or (b) was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Because there was a reasoned state-court judgment rejecting Hayward's federal claims--the Superior Court judgment--we look through the later unexplained order [*12] of the California Supreme Court and analyze whether the reasoned state judgment was erroneous under the standard of § 2254(d). *See Ylst v. Nunnemaker*, 501 U.S. 797, 804, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).

6 The government argues that we lack jurisdiction because Hayward did not obtain a certificate of appealability. However, in *Rosas v. Nielsen*, 428 F.3d 1229, 1232

(9th Cir. 2005), we explicitly held that AEDPA does not require a petitioner to obtain a certificate of appealability when the federal claim underlying the petition is that the petitioner was unconstitutionally denied parole. Because Hayward's petition challenges the Governor's decision that denied him parole, Hayward did not need to obtain a certificate of appealability to present his claim to us.

## III

The Supreme Court has instructed us to analyze a prisoner's due process claim in two steps. We first ask whether the prisoner had a liberty or property interest with which the State has interfered. And if so, we then ask whether the procedures accompanying that interference were constitutionally sufficient. *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006). If we determine **[*13]** that the State has violated the prisoner's due process rights, we may only grant habeas relief if the state court's incorrect decision was contrary to or an unreasonable application of the Supreme Court's holdings. *Carey v. Musladin*, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006); *Williams v. Taylor*, 529 U.S. 362, 410-12, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

As to the first question, in *Sass*, 461 F.3d at 1127-28, we held that California prisoners have a liberty interest in parole. This interest arises as a result of California Penal Code section 3041(b), which provides that, at a parole consideration hearing, the Board "*shall* set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." Cal. Penal Code § 3041(b) (emphasis added). Thus, by reversing Hayward's parole grant, the Governor deprived him of a constitutionally-protected liberty interest. The primary questions for us, then, are (1) whether California provided the constitutionally-required procedural safeguards when depriving Hayward of his liberty interest, and, **[*14]** if not, (2) whether the Los Angeles County Superior Court's conclusion that it did was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

Under California law, the Governor, in considering whether to reverse a grant of parole by the Board, must consider the same factors the Board is required to consider. *See* Cal. Const. art. 5, § 8(b); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d 174, 210 (Cal. 2002). Accordingly, we review the Governor's decision to reverse a parole grant under the same procedural due process principles we use to review challenges to the Board's denial of parole.

We have held that "the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.' " *Irons v. Carey*, 505 F.3d 846, at 851, 2007 WL 2027359, at *3 (9th Cir. 2007) (quoting *Hill*, 472 U.S. at 457; *Sass*, 461 F.3d at 1128-29)). "When we assess whether a state

parole board's suitability determination was supported by 'some evidence' in a habeas case, our analysis is framed by the statutes and [*15] regulations governing parole suitability determinations in the relevant state." *Id.* Accordingly, we first "look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole." *Id.* Then, we "must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill.*" *Id.*

Under California law, prisoners serving an indeterminate life sentence, like Hayward, become eligible for a parole date after serving minimum terms of confinement required by statute. *See Dannenberg,* 104 P.3d at 785; *see also* Cal. Penal Code § 3041(a). California law provides that, at that point, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for" the prisoner. Cal. Penal Code § 3041(b).

Accordingly, regulations promulgated by the Board pursuant to California Penal Code section 3041(a) [*16] · provide that "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2402(a). The Board decides whether a prisoner is too dangerous to be suitable for parole by applying factors it has set forth in the California Code of Regulations. · When the Governor reviews a decision of the Board, he must apply these same criteria.

7  California Penal Code section 3041(a) instructs the Board to "establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime."

8  The following factors tend to show unsuitability for parole: (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner; (2) the prisoner has a previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner has committed sadistic sex offenses; (5) the prisoner has a history of mental or psychological problems; and (6) the prisoner has engaged in serious misconduct [*17] while in prison. Cal. Code Regs. tit. 15, § 2402(c). Factors tending to show suitability for parole include: (1) the prisoner has no juvenile record; (2) the prisoner has a stable social history; (3) the prisoner has shown signs of remorse; (4) the prisoner was motivated to commit the crime out of stress; (5) the prisoner suffered from Battered Woman Syndrome; (6) the prisoner lacks a significant criminal history; (7) the prisoner's age reduces the probability of recidivism; (8) the prisoner has realistic plans for release; and (9) the prisoner's behavior in prison indicates an ability to function within the law upon release. *Id.* §

2402(d).

Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made clear that the "findings that are necessary to deem a prisoner unsuitable for parole," *Irons*, 505 F.3d at 851, 2007 WL 2927359, at *3, are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety. *In re Dannenberg*, 156 Cal. App. 4th 1387, 2007 WL 3408290, at *9 (Cal. Ct. App. 2007), *modified*, 2007 Cal. App. LEXIS 1985, 2007 WL 4227229 (Cal. Ct. App. Dec. 3, 2007); **[*18]** *In re Lee*, 143 Cal. App. 4th 1400, 1408, 49 Cal. Rptr. 3d 931 (Cal. Ct. App. 2006); *In re Scott*, 133 Cal. App. 4th 573, 595, 34 Cal. Rptr. 3d 905 (Cal. Ct. App. 2005); *see* Cal. Penal Code § 3041(b) (providing that the Board "shall set a release date unless . . . consideration of the public safety requires a more lengthy period of incarceration for this individual"). For our purposes, then, "[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." *Lee*, 143 Cal. App. 4th at 1408 (citations and footnote omitted); *see also In re Elkins*, 144 Cal. App. 4th 475, 499, 50 Cal. Rptr. 3d 503 (Cal. Ct. App. 2006) (holding that the "governor, in reviewing a suitability determination, must remain focused . . . on facts indicating that release currently poses 'an unreasonable risk of danger to society' " (citing Cal. Code Regs. tit. 15, § 2402(a)));*Scott*, 133 Cal. App. 4th at 591 ("The factor statutorily required to be considered, and the overarching consideration, is 'public **[*19]** safety.' " (citing Cal. Penal Code § 3041(b))).

After carefully reviewing the record, we conclude that the Los Angeles County Superior Court unreasonably applied the some evidence standard when it concluded that the Governor's reversal of the Board's grant of parole to Hayward was justified. We conclude that, viewed fairly and in its context, no evidence in the record supports a determination that Hayward's release would unreasonably endanger public safety.

Hayward's initial crime was committed decades ago and with the type of unusual provocation, the victim's threat to or assault of Hayward's girlfriend, that seems not likely to recur in the years of life remaining for him. Hayward has accepted responsibility for his crime and does not seek to minimize its impact. At the same time, several additional factors demonstrate persuasively that Hayward can be released under supervisory conditions presenting no probable danger to society: his record of education in prison; the lack of any recent disciplinary offense or misconduct in prison; the many people who have gone to bat for him in their letters; along with the considered decisions of the parole board to first grant Hayward parole on **[*20]** his tenth application in 2001 and then, despite the Governor's rejection of the parole board's 2001 decision, decline to adopt the Governor's unsuitability findings and grant Hayward parole again upon his eleventh application in 2003.

Many of the factual findings upon which the Governor relied in reversing the Board's

grant of parole have no evidentiary support in the record. First, the Governor asserted that Hayward was unsuitable for parole because, until relatively recently, he refused to accept responsibility for his crime and did not demonstrate any remorse for his crime. However, Hayward admitted his guilt and took responsibility for his crime at a 1993 Board hearing, more than ten years before the Governor reversed the parole grant.

Second, the Governor based his reversal of Hayward's parole on his finding that Hayward had an extensive record of alcohol and drug abuse. Hayward, however, has not used alcohol since 1974, much less abused it. The Governor stated that Hayward used heroin from 1955 until 1976. To the contrary, Hayward experimented with the drug for one month, while he was in prison, and then immediately quit and has never used it again. The Governor also expressed [*21] his concern that Hayward had only engaged in limited substance abuse counseling. However, Hayward has participated in the Yoke Fellows, Project Change, and other support and counseling programs for many years.

Third, the Governor relied on Hayward's "lifetime of escalating criminality and violence" in reversing his parole. The Governor stated that Hayward admitted he was responsible for 75 to 120 very serious crimes for which he was never arrested. There is simply no basis for such an assertion in the record.

Fourth, the Governor stated that Hayward's psychological "evaluators remain convinced that he poses a danger to society." Again, this is simply not true. The most recent psychological evaluation, performed by Dr. Rueschenberg in 2002, concluded that Hayward had a viable parole plan and that he had a favorable prognosis for adjusting to living in the community. While Dr. Rueschenberg concluded that Hayward presented a *low-to-moderate* risk of danger to society, he also emphasized that any risk Hayward might pose was adequately contained.

Having rejected the grounds relied upon by the Governor that are not supported by evidence in the record, we are left with only three grounds that [*22] the Governor possibly could have based his reversal of parole on: (1) Hayward's criminal history (other than the 75 to 120 alleged crimes not supported by the record); (2) Hayward's unstable social history, including a history of gang involvement; and (3) the nature of Hayward's commitment offense. ⁹

9 In addition to the factors we discuss here, the Governor also considered the opposition of the Los Angeles County District Attorney to Hayward's release. Even though the district attorney is permitted to attend parole hearings and express an opinion on the prisoner's suitability for parole, *see* Cal. Penal Code § 3041.7 (providing that prosecutor may be present at a parole hearing "to represent the interests of the people"), the district attorney's opinion, without more, cannot be considered "some evidence" under *Hill* that supports the Governor's reversal of parole. *Rosenkrantz v. Marshall*, 444 F. Supp. 2d 1063, 1080 n.14 (C.D. Cal. 2006).

We have cautioned that a continued reliance on an unchanging factor such as the circumstances of the commitment offense, pre-conviction criminal history, or other past

conduct, might in some cases result in a due process violation at some point. *Biggs v. Terhune*, 334 F.3d 910, 916 (9th Cir. 2003). **[\*23]** *Biggs* upheld the Board's denial of parole based on the commitment offense, but cautioned:

> [T]he parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

*Id.* We further noted that the denial of parole based on "[a] continued reliance . . . on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Id.* at 915.

We restated this point in *Irons*, noting that "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Irons*, 505 F.3d at 854, 2007 WL 2027359, at \*6. **[\*24]** "The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." *Scott*, 133 Cal. App. 4th at 595.

We turn to the three remaining factors that the Governor cited in support of his reversal of the Board's grant of parole and conclude that these factors, whether analyzed individually or collectively, do not constitute evidence that Hayward would pose a danger to public safety if released from prison.

First, the Governor cited Hayward's "long criminal history." The Governor specifically noted Hayward's history of juvenile mischief and asserted that Hayward was first placed on probation at age eight. Hayward's juvenile conduct, which occurred nearly fifty years ago, provides no basis for a conclusion that Hayward currently poses a risk to public safety. Though Hayward was arrested many times before he committed the murder in this case, these arrests occurred thirty or more years ago and also do not support a conclusion that Hayward currently poses any threat to public safety. It can hardly be doubted that time may attenuate **[\*25]** the taint of certain prior misconduct, and this is particularly true as applied to consideration of Hayward's misconduct before he committed the murder that led to his conviction.

Second, the Governor reversed the Board's grant of parole to Hayward because of his unstable social history, including his history of gang activity both inside and outside of prison. However, Hayward quit the Vagos gang in 1981 and has not been involved in any

prison gang activity since 1989. Hayward's social history is, as a whole, quite stable. After Hayward committed the murder in this case, he married his girlfriend. He maintains contact with his children, parents, and other relatives. As indicated by the letters Hayward's relatives submitted to the Board, they look forward to welcoming him back into their family if he is released. In concluding that Hayward had an unstable social history, the Governor also emphasized that when Hayward was eleven years old, he impregnated an eleven-year-old girl. This conduct, which occurred more than fifty years ago, does not provide any evidence that Hayward currently poses a risk to public safety.

The final basis for the Governor's reversal of Hayward's parole is based [*26] on the gravity of Hayward's commitment offense, as the Governor found that Hayward's conduct was particularly heinous. We conclude, however, that in the unusual circumstances of this case, including Hayward's rehabilitation by education and conduct while imprisoned and the Board's successive favorable views of his application for release, Hayward's commitment offense, which occurred twenty-five years ago, cannot demonstrate that Hayward's release will pose an imminent danger to public safety. *See Rosenkrantz v. Marshall*, 444 F. Supp. 2d 1063, 1084 (C.D. Cal. 2006) ("While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances--after nearly two decades of incarceration and half a dozen parole suitability hearings--violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is [*27] nil."); *Scott*, 133 Cal. App. 4th at 595 ("[T]he predictive value of the commitment offense may be very questionable after a long period of time."). Hayward is now sixty-four years old. The Governor was reviewing Hayward's eleventh parole suitability hearing. Hayward had been in prison for nearly thirty years and had an exemplary record of conduct for most of that time. In light of the extraordinary circumstances of this case--given the provocation for Hayward's violent crime in 1978, his incarceration for almost thirty years with his positive prison record in recent times, and the favorable discretionary decisions of the Board in successive hearings, which were reversed by the Governor on factual premises most of which were not documented in the record--we conclude that the unchanging factor of the gravity of Hayward's commitment offense had no predictive value regarding his suitability for parole. In the circumstances of this case, the Governor violated Hayward's due process rights by relying on that stale and static factor in reversing his parole grant. [10]

> 10   We emphasize that Hayward was convicted of second degree murder for stabbing a man he believed had physically assaulted his [*28] girlfriend. In concluding that Hayward's conviction offense does not, at this time, after nearly thirty years of incarceration, accurately predict that Hayward currently poses a danger to society, we do recognize that certain conviction offenses may be so

"heinous, atrocious or cruel" that a prisoner's due process rights might not be violated if he or she were denied parole solely on the basis of the nature of the conviction offense. We need not identify those offenses here. We confine our holding to the facts of this case and the nature of Hayward's particular conviction offense.

The Governor also based his reversal of the Board's parole grant on Hayward's motive to commit the crime. The Governor concluded that the "official record" indicated that Hayward committed the crime in retaliation for the victim slapping Hayward's then-girlfriend. However, the Board concluded that the victim had in fact battered and attempted to rape Hayward's future wife, and that Hayward attacked the victim in retaliation for that incident, after being provoked by the victim throwing a beer bottle at him. The Governor's conclusion that Hayward committed the crime in retaliation for a slap is based on the [*29] incomplete facts recited in the opinion of the California Court of Appeal affirming Hayward's conviction on direct review. Even if the Governor's interpretation of the facts is the correct one, the unchanging factor of Hayward's motive for committing the crime did not provide a factual basis for the Governor to conclude that Hayward's release presented a risk to public safety. The Governor violated Hayward's due process rights by relying on the unchanging factor of motive for the commitment offense in reversing parole.

Hayward was initially sentenced to a term of fifteen years to life in prison. Hayward has been in prison for twenty-seven years. In *Irons*, we noted that

in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in *Biggs, Sass*, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.

*Irons*, 505 F.3d at 853, 2007 WL 2027359, at *6. Therefore, we concluded [*30] that "[a]ll we held in those cases and all we hold today . . . is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." *Id.* Here, by contrast, Hayward has long served more than his minimum fifteen-year term of imprisonment. We hold that the Governor's reversal of parole in this case was not supported by any evidence that Hayward's release would threaten public safety, and that the Governor's reversal of his parole thus violated his due process rights.

For the same reasons, we conclude that the Los Angeles County Superior Court unreasonably applied the some evidence standard to Hayward's petition. The Superior Court identified two pieces of evidence supporting the Governor's reversal of parole. First, the Superior Court noted that the nature of the commitment offense supported the

Governor's finding that Hayward was unsuitable for parole. However, as we have explained, in the circumstances of this case, reliance on Hayward's commitment offense was not sufficient to provide some evidence that his release would endanger the public. Second, **[*31]** the Superior Court noted that the "somewhat unfavorable psychological and counselor reports" provided some evidence to support the Governor's reversal. However, as we discussed above, the reports are not "somewhat unfavorable," but instead give a positive report on Hayward's potential to adapt to freedom and to avoid committing crimes if released. Dr. Rueschenberg, who prepared the most recent psychological evaluation of Hayward, concluded that "Mr. Hayward's prognosis for community living seems to be favorable," that "he appears to have a viable parole plan," and that he "appears to be a strong candidate for a favorable readjustment in the community." The Superior Court's determination that Hayward's psychological and counselor reports were "somewhat unfavorable" was an unreasonable interpretation of those reports, and the Superior Court's conclusion that the reports provided some evidence to support the Governor's determination that Hayward was not suitable for parole was an unreasonable application of the some evidence standard articulated in *Hill*.

In sum, we conclude that, considering all the circumstances, the denial of parole to Hayward denied him due process. We therefore reverse **[*32]** the district court's order denying Hayward's petition for a writ of habeas corpus, and remand the case with instructions to grant the writ.

**REVERSED AND REMANDED.**

EXHIBIT "F"

Court of Appeal, First Appellate District, Div. 5 - No. A120649
**S161586**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JESSE L. REED on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

MAY 1 4 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

JESSE L. REED D-07717
SAN QUENTIN STATE PRISON 3-N-79
SAN QUENTIN, CA 94974

UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3433



RECEIVED
JUN    4 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

legal
mail



UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3433

RECEIVED

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



legal mail